KLEINFELD, Circuit Judge:
 

 The issue in this case is a prosecutor’s duty when his witness lies. LaPage argues that his conviction under 18 U.S.C. § 1014 for making false statements to a federally insured bank to obtain a loan must be reversed because the prosecutor knowingly used false testimony at his trial.
 

 FACTS
 

 In- 1991, LaPage met with Michael Manes, a loan broker, about refinancing a loan on his property. LaPage said he was in serious financial trouble and wanted to “get a loan and get more money out” of his home so that he could pay off his mounting debts and fix up his house in order to sell it. Manes delivered false income tax returns and a false loan application to the bank signed by LaPage. LaPage was convicted of making false statements to a bank.
 
 [2]
 
 There was no question that what purported to be LaPage’s tax returns were signed by LaPage and submitted to the bank, but they were not what LaPage had submitted to the IRS.
 
 [3]
 
 And there was also no question that Manes, not LaPage, submitted them, and that Manes, not LaPage, got almost all the money from the bank loan. The issue was whether LaPage had
 
 *490
 
 used Manes, knowing that Manes was using false papers on his behalf, or whether LaPage was an innocent dupe of Manes, signing papers Manes told him to sign without understanding what he was doing.
 

 The prosecution’s theory, based entirely on Manes’s testimony, was that Manes had told LaPage that he could not get a loan unless he submitted false income tax returns, and that LaPage had then agreed to submit the false returns. The defense argued that LaPage did not know about the false returns, and that Manes had orchestrated the scheme to get the commission. Manes was the prosecution’s star witness. The case depended on whether the jury believed Manes’s testimony that LaPage understood that he was helping to prepare a phony document to trick the bank.
 

 Manes testified that he had asked an accountant named Pinkston to prepare false tax returns for him. Pinkston, however, testified that she had not prepared false returns, and that what purported to be her signature on them was not her handwriting. There had been a previous trial ending with a hung jury. At the earlier trial, Manes had also testified that Pinkston prepared the false returns for him, but Manes’s credibility suffered when Pinkston walked into the courtroom and Manes did not recognize her. In the retrial, from which this appeal is taken, Manes said he had recognized Pinkston.
 

 Manes’s testimony was false, and the prosecutor knew that Manes’s testimony was false.
 
 [4]
 
 Here is Manes’s testimony at this, the third trial:
 

 Q Were you able to recognize Ms. Pinkston in the Spring of 1999 in this courtroom?
 

 A Yes.
 

 Q Yesterday, I believe that you indicated that at a prior proceeding you were able to identify Diane Pinskton. Is that what you said yesterday?
 

 A Yes.
 

 Q And do you stand by that statement today?
 

 A After thinking about it, I knew that it was her. I haven’t seen her in a long time, so I think I might have qualified my answer with that.
 

 Q So, it’s your testimony that you did identify her or did not identify her?
 

 A It’s my opinion that I identified her.
 

 The transcript of the prior trial, however, reads as follows:
 

 Q Mr. Manes, do you recognize the lady [Pinkston] who has just entered the courtroom?
 

 A No.
 

 Thus it was plain that Manes testified under oath during the earlier trial that he did
 
 not
 
 recognize Pinkston and that he testified in this trial that he
 
 did
 
 recognize her in the earlier trial, and had identified her. And it was plain that the prosecutor knew it, because the matter was important and the same prosecutor tried the case both times.
 

 The prosecutor^ did nothing to correct the false impression of the facts left with the jury. Defense counsel ineffectually attempted to impeach Manes.
 
 [5]
 
 The prosecutor attempted to bolster Manes’s credibility in his closing argument in chief by arguing that Manes was a credible witness. Finally, in his rebuttal closing argument,
 
 *491
 
 the prosecutor conceded that Manes had lied.
 
 [6]
 

 ANALYSIS
 

 The government argues that the false testimony did not affect the outcome of the trial because the defense knew that Manes’s testimony was false at the time it was given and had the opportunity to impeach him with the prior trial transcript, and because the government finally conceded that Manes had lied in its rebuttal closing argument.
 

 The due process clause entitles defendants in criminal cases to fundamentally fair procedures. It is fundamentally unfair for a prosecutor to knowingly present perjury to the jury. Over forty years ago, the Supreme Court made it clear that “a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.”
 
 [7]
 
 “The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.”
 
 [8]
 
 The Court explained that this principle “does not cease to apply merely because the false testimony goes only to the credibility of the witness.”
 
 [9]
 
 Rather, “[a] lie is a lie, no matter what its subject.”
 
 [10]
 
 Because the use of known lies to get a conviction deprives a defendant of his constitutional right to due process of law, we must reverse LaPage’s conviction unless Manes’s false testimony was “harmless beyond a reasonable doubt.”
 
 [11]
 
 That is, we must reverse “ ‘if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.’ ”
 
 [12]
 

 There is a “reasonable likelihood” that the false testimony affected the outcome. The case was close. This was the third trial. The first resulted in a conviction that was reversed. The second ended in a hung jury. LaPage’s guilt did not make sense, unless he was an utter fool, because he did not get the money. The phony tax return was used to bolster a loan application for $626,200. LaPage’s motive was to “get more money out” of his house in order to apply the cash to other debts. Yet the only cash LaPage got was $43.66. By contrast, Manes got a $13,000 commission, about 300 times as much money as his supposed principal. Everyone else involved, even the loan officer at the bank, got more cash than LaPage. Thus, if the jury followed the money to decipher the fraudulent scheme, LaPage looked like the sucker, not the mastermind, making it plausible that he signed the stack of papers Manes told him to sign without paying attention to what they said. The jury had to buy Manes’s testimony to convict LaPage. Pinkston was a critical actor in Manes’s account. So if the jury had clearly understood that Manes had lied to them about recognizing Pinkston, there is a “reasonable likelihood” that the jurors would have had a reasonable doubt about LaPage’s guilt.
 

 The government correctly argues that there was other evidence from which the jury could have figured out that Manes had lied about Pinkston and other matters, and that the defense knew as plainly as the
 
 *492
 
 prosecutor that Manes had lied. But the government’s duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false. Where the prosecutor knows that his witness has lied, he has a constitutional duty to correct the false impression of the facts.
 
 [13]
 
 Many prosecutors, when this occurs, interrupt their own questioning, and work out in a bench conference with the judge and defense counsel how to inform the jury immediately that the testimony is false. By contrast, in this case, the prosecutor sat silently as his witness lied, and sat silently as his witness evaded defense counsel’s ineffectual cross-examination. In closing argument, the prosecutor continued to do nothing to remedy the falsehood. Only after the defense has used up its last chance to address the jury in closing argument did the prosecutor concede on rebuttal that Manes had lied about Pinkston. Though making the concession, the prosecutor argued that Manes’s lie about Pink-ston was not about anything important so it should not affect the verdict. Because the prosecutor delayed the correction until rebuttal argument, the defense could no longer explain why the lie about Pinkston was important.
 

 All perjury pollutes a trial, making it hard for jurors to see the truth. No lawyer, whether prosecutor or defense counsel, civil or criminal, may knowingly present lies to a jury and then sit idly by while opposing counsel struggles to contain this pollution of the trial.
 
 [14]
 
 The jury understands defense counsel’s duty of advocacy and frequently listens to defense counsel with skepticism. A prosecutor has a special duty commensurate with a prosecutor’s unique power, to assure that defendants receive fair trials. “It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate method to bring about one.”
 
 [15]
 

 The failure to correct prosecutorial testimony known to be false may have made a difference to the outcome in this case, so the conviction cannot stand.
 

 REVERSED.
 

 [2]
 

 .
 
 See
 
 18 U.S.C. § 1014.
 

 [3]
 

 .
 
 See United States v. Hicks,
 
 217 F.3d 1038, 1041-43 (9th Cir.2000).
 

 [4]
 

 . LaPage also argues that the testimony of Special Agent Barnum was false. We need not reach the issue, because of our resolution regarding Manes's testimony.
 

 [5]
 

 . To try to impeach Manes the defense had the transcript of the prior trial read to the jury. But the prior transcript did not state that it was Diane Pinkston who entered the courtroom when Manes gave the answer "no.” And defense counsel asked "do you recall” being unable to identify Pinkston, instead of "did you” fail to identify Pinkston, enabling Manes to play games with him by testifying about the present state of his recollection of his earlier testimony.
 

 [6]
 

 . The prosecutor stated the following:
 

 Now, you heard that, in fact, the prior proceeding, earlier this year, Mr. Manes was on the stand. Diane Pinkston came in here, and he was asked the question: Do you recognize that woman? And he said no. When he testified on the stand the other day, he said I thought — I remember recognizing her, not being sure, but I remember saying it was her.
 

 [7]
 

 .
 
 Napue v. Illinois,
 
 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).
 

 [8]
 

 .
 
 id.
 

 [9]
 

 .
 
 Id.
 

 [10]
 

 .
 
 Id.
 
 at 270, 79 S.Ct. 1173.
 

 [11]
 

 .
 
 United States v. Bagley,
 
 473 U.S. 667, 679 n. 9, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
 

 [12]
 

 .
 
 Id.
 
 (quoting
 
 United States v. Agurs,
 
 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).
 

 [13]
 

 .
 
 See Napue,
 
 360 U.S. at 269, 79 S.Ct. 1173;
 
 cf.
 
 Restatement (Third) of law Governing Lawyers § 180(2) (1997) ("If a lawyer has offered testimony or other evidence as to a material issue of fact and comes to know of its falsity, the lawyer must take reasonable remedial measures.").
 

 [14]
 

 .
 
 Cf. Nix
 
 v.
 
 Whiteside,
 
 475 U.S. 157, 166, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law.”).
 

 [15]
 

 .Berger v. United States,
 
 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), overruled on other grounds by
 
 Stirone v. United States,
 
 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).