[No. E032037. Fourth Dist., Div. Two. Oct. 27, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ANTHONY MORALES, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV, V.C, VII, VIII, IX, X, and XI.

## COUNSEL

Ivy K. Kessel, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Pamela A. Ratner Sobeck, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—In defendant John Anthony Morales's first trial, the jury acquitted him on one count of murder, but deadlocked on two counts of robbery. In a retrial, the second jury found him guilty on both counts of robbery, as well as on a newly alleged third count of attempted robbery. Various enhancements, including gang enhancements to all three counts, were found true.

In the published portions of this opinion, we will hold that:

(1) The first jury's verdicts, acquitting defendant of murder (including felony murder) yet deadlocking on robbery, were inconsistent and therefore did not bar a retrial of the robbery charges.

(2) Defendant cannot show that prosecution witness Joe Virgen testified falsely; even assuming, however, that Virgen did testify falsely, the prosecutor did not commit misconduct by presenting his testimony because other evidence and the prosecutor's own closing argument fully disclosed any falsity.

(3) The evidence that defendant knowingly committed the charged crimes in association with two fellow gang members was sufficient to support the jury's findings on the gang enhancements that (a) the crimes were "committed for the benefit of, at the direction of, or in association with" a gang, and (b) defendant committed the crimes "with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (Pen. Code, § 186.22, subd. (b)(1).)

In the unpublished portions of this opinion, we find no other reversible error. Accordingly, we will affirm.

I

## FACTUAL BACKGROUND

A. *The Prosecution's Case.*

1. *Background.*

Richard and Ralph Avila were brothers. In May 1999, Richard was 17; Ralph was about 10 years older. Joe Virgen was their friend and neighbor.

2. *Testimony of Joe Virgen.*

According to Virgen, on May 28, 1999, about 4:00 p.m., Ralph came over to visit him. Around 6:00 p.m., Richard arrived. They all drank beer and listened to music. The group finished one 24-pack of beer and started in on a second. Virgen drank a total of 12 to 15 beers; Ralph drank about as many. Richard drank less. Virgen was drunk. He assumed Ralph was, too, although Ralph did not act drunk.

Around 10:00 or 11:00 p.m., Richard asked "if his home boy could come over." After Virgen agreed, Richard used Virgen's telephone to call this person. Around 2:00 a.m., Virgen went out to the living room; he found three men he did not know talking to Richard and Ralph. Richard introduced them. At trial, Virgen could not identify defendant as one of the men.

Virgen could not remember whether any of the three men drank beer. A methamphetamine pipe was passed around. Virgen and Richard each took a "hit"; Ralph did not. None of the three men appeared to be drunk or high.

After 45 minutes or an hour, Virgen went back to his bedroom to make a phone call. Before he could do so, however, one of the three men put a gun to the back of his head and demanded money, jewelry, and guns.

Virgen handed over his wallet; it contained over $1,100, because he had just gotten paid. The gunman made Virgen empty out his jewelry boxes onto his bed, but Virgen had no jewelry. The gunman rummaged around in Virgen's closet. There were no guns in the house, because Virgen was on probation, but there were boxes of bullets in the closet.

Meanwhile, Virgen heard a "commotion" in the living room. He heard someone say, "Give me your money or I'll shoot you." A second man with a gun came in the bedroom and said, "[D]on't fucking lie or I'll shoot you." That man rummaged through the closet, too, then left.

Seconds later, Virgen heard shots. The gunman put his gun to Virgen's forehead, paused for a second, then ran out of the room. Virgen heard a car "peel out . . . ." He went out to the front porch. He saw Ralph lying there, bleeding. Richard and a neighbor were with him.

Virgen denied that there was any drug deal going on. He admitted having two prior felony convictions for possession of methamphetamine for sale.

### 3. Testimony of Richard Avila.

A week or two before the shooting, Richard testified, he had arranged for Virgen to buy methamphetamine from defendant. Defendant, accompanied by his girlfriend, had delivered the methamphetamine to Virgen's house.

On May 28, 1999, in the early afternoon, Richard went to Virgen's house. Virgen was drinking beer. Around 11:00 p.m., at Virgen's request, Richard phoned defendant to buy some more methamphetamine. Defendant agreed to sell one ounce of methamphetamine for about $1,000. He said he would bring it to Virgen's house in a couple of hours.

Around midnight, Ralph dropped in. He drank some beer. Because Richard knew that Ralph did not approve of methamphetamine, he warned him that "there was a drug deal going down . . . ."

About 2:00 a.m., defendant arrived. Richard was outside waiting for him. Defendant was driving his own car; Joe Moreno was with him. George Flores also accompanied them, driving a separate car. Defendant gave Richard some of the methamphetamine in a pipe, to sample. Richard smoked it. He then invited them all into the house.

Defendant introduced Flores as "Spooky" and Moreno as "Huero Joe." Everybody except defendant drank beer. Richard had had a total of about two beers. A methamphetamine pipe was passed around, and everybody except Ralph smoked some. Richard felt a "buzz."

After 30 or 45 minutes, Virgen and defendant went into the kitchen. Shortly after that, Richard saw defendant going down the hallway that led to Virgen's bedroom. Flores and Moreno pulled out guns. They ordered Richard and Ralph to get on the floor and to hand over their money and jewelry. Richard got down on his knees. They then told Richard and Ralph to go to a corner; Richard complied. From there, he could see defendant, holding a gun, pushing Virgen into the bathroom.

Ralph sat in a chair. He did get down on his knees briefly, but got up again. He kept "asking them why they were doing this." Twice, he made a grab for Moreno's gun. After declaring that "[h]e was not going to give up his stuff," Ralph walked out a sliding glass door into the back yard, ignoring Flores and Moreno's threats to kill him if he left.

Flores and Moreno put their guns to Richard's head and told him he was going to die. Flores took his wallet. "[A] couple [of] seconds later," Ralph came back in. He "tried to talk to them some more and they wouldn't."

Ralph said, "[F]uck it, Rich," then put up his fists, in "boxing position." He was six feet seven inches tall; he weighed 281 pounds. He went toward Flores and Moreno. They backed up toward the front door. They pointed their guns at Ralph and told him to stop, but he just kept going. They fired. He fell on the porch. Flores and Moreno ran outside and left in Flores's car. Defendant ran out to the living room; Richard saw a gun in his hand. After seeing Ralph lying on the porch, defendant left in his own car.

Richard called 911. While he was on the phone, a neighbor arrived. Virgen emerged from a back room, saw Ralph, and started "tripping."

Initially, when Richard was interviewed by the police, he did not tell them about the drug deal. Once they told him that Ralph was "not doing so good," however, he told them the truth.

### 4. *Other Evidence and Testimony.*

Five bullets struck Ralph—three from one gun and two from a different gun. He died of his wounds. His blood alcohol level was 0.19 percent.

Virgen's next-door neighbor testified that she heard the shots, then ran over to Virgen's house. Virgen looked scared. He told her, "[T]here was a gun to [my] head," and added, "I thought I was dead."

The police searched the house but found no guns, no drugs, and no methamphetamine pipes. Virgen's jewelry boxes were out on his bed. A mug, a box of bullets, and other boxes were on the floor of his bedroom. Defendant's fingerprints were found on a box of bullets in Virgen's bedroom closet.

The next day, the police talked to defendant's mother. She gave them his address. A police officer went to defendant's house and observed Richard Renteria driving defendant away. Other officers stopped the car and arrested both of them. Defendant had $1,268 in his pocket. In an in-field showup, Virgen identified defendant as the gunman who had robbed him.

Renteria told the police that defendant had jumped in his car and had then explained, "I got into it last night in Riverside. Me, Huero Joe and Spooky robbed some guys. My mom just called and told me the cops had the house surrounded. You got to get me out of here." Defendant displayed a "fist full" of cash and said, "[W]e've got the money, but we threw the guns out on the freeway on the way home from Riverside last night." Renteria also said that "he would absolutely not testify" against defendant, Flores, or Moreno, because he was afraid of gang retaliation. At trial, Renteria denied making any of these statements.

### B. *The Defense Case.*

Defendant admitted agreeing, through Richard, to sell methamphetamine to Virgen. Defendant asked them to come to his house or to meet him somewhere in between, but Richard said no, they wanted defendant to deliver the methamphetamine to Virgen's house in Riverside. Defendant asked Flores and Moreno to go with him because he did not have a driver's license, and also because he did not know Richard and Virgen very well.

When they arrived, Richard met them at the curb. He smoked some of the methamphetamine, to "test it out." Ralph and Virgen came to the doorway and told Richard to ask them to come in off the street. Defendant gave Virgen the methamphetamine. Everyone except defendant drank beer. Two pipes of methamphetamine were passed around; defendant took a "hit."

After about 45 minutes, defendant asked Virgen to pay for the methamphetamine. Virgen led defendant into the back bedroom. Virgen asked defendant if he was interested in buying a nine-millimeter handgun; he took the gun out of the closet and handed it to defendant. Defendant declined and put the gun back in the closet, on top of a box of bullets. Virgen then paid defendant $1,100 for the methamphetamine.

As defendant was counting the money, he heard gunshots. He was "shocked." He walked slowly out to the living room, and then to the front

door. He saw Ralph lying on the porch, bleeding. He did not see Richard anywhere. Flores and Moreno were already gone. Defendant got in his car and drove home.

The next morning, defendant's mother phoned him. She told him his house was "surrounded," and he was going to jail. Defendant lived with his grandmother, his girlfriend, and her seven-year-old daughter. Rather than have the police come in the house with guns drawn, he jumped in Renteria's car and asked him for a ride.

Defendant denied having a gun at Virgen's house. He denied knowing that either Flores or Moreno had a gun.

### C. *Gang Evidence.*

Deputy Steven Skahill, an expert on gangs, testified that Puente Trece (i.e., Puente 13) was a criminal street gang based in La Puente. Dial Boulevard was one of several Puente Trece cliques. The primary activities of Puente Trece included murder, drive-by shootings, armed robbery, selling methamphetamine, and witness intimidation. Members of Puente Trece had been convicted of multiple murders.

Defendant had several tattoos, including "Puente 13," "Puente," "Dial Boulevard," and "DB." He admitted that everybody, including members of Puente Trece, called him "Johnno." A notebook in his bedroom had gang writing on it, including "P-13" and "DB," and a gang "roll call," in which the first name was "Johnno." Magazines in his dresser had gang writing on them, including "Puente 13" and "Johnno." Boxes found in his garage bore gang graffiti, including "Dial Boulevard" and "Johnno." There was a gang roll call on a fence in defendant's back yard; the first name on it was "Johnno."

Deputy Skahill concluded that defendant was a member of Puente Trece, and specifically a member of Dial Boulevard. Flores and Moreno were also members of Puente Trece. Flores's moniker was "Spooky"; Moreno's was "Huero Joe." Renteria, too, was a member of Puente Trece. His moniker was "Beetle."

Defendant testified that, as of May 1999, he was trying to stay away from "gang culture." He was on parole; it was one of the conditions of his parole that he not associate with gang members. Flores, Moreno, and Renteria were childhood friends of his. He had not gotten any tattoos since 1994 or 1995. The gang graffiti in his backyard were likewise very old. He denied writing on the magazines. It was "[p]ossible" that he wrote in the notebook, but he was not sure.

## II

## PROCEDURAL BACKGROUND

Defendant, together with Flores and Moreno, was charged with murder of Ralph Avila (Pen. Code, § 187, subd. (a)), robbery from Richard Avila, and robbery from Joe Virgen (Pen. Code, § 211). In connection with the murder, robbery-murder and burglary-murder special circumstances were alleged. (Pen. Code, § 190.2, subd. (a)(17)(A), (G).) It was further alleged that the robberies were committed in an inhabited dwelling while voluntarily acting in concert with two or more other persons. (Pen. Code, § 213, subd. (a)(1)(A).) In connection with all three counts, gang enhancements (Pen. Code, § 186.22, subd. (b)(1)) were alleged; as to defendant, personal firearm use (Pen. Code, § 12022.53, subd. (b)) and gang/vicarious firearm discharge/great bodily injury enhancements (Pen. Code, § 12022.53, subds. (d), (e)(1)) were alleged; and as to Flores and Moreno, personal firearm discharge/great bodily injury enhancements (Pen. Code, § 12022.53, subd. (d)) were alleged. Defendant alone was charged with a fourth count, possession of a firearm with a prior felony conviction. (Pen. Code, § 12021, subd. (a)(1).)

A jury found Flores and Moreno guilty of second degree murder. It found defendant not guilty of murder. Nevertheless, as to all three defendants, it found the gang enhancement to the murder count to be true. It also found defendant guilty of possession of a firearm with a prior felony conviction. It deadlocked on the two robbery counts.

Defendant was retried on the two robbery counts. Before trial, the information was amended to add one count of attempted robbery from Ralph Avila, once again with an in-concert allegation and with gang, personal firearm use, and gang/vicarious firearm discharge/great bodily injury enhancements. This time, the jury found defendant guilty on all counts; it found all in-concert and enhancement allegations true.

For purposes of the three strikes law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12), it was alleged that defendant had one "strike" prior conviction. That prior conviction was also alleged as a five-year prior serious felony conviction enhancement. (Pen. Code, § 667, subd. (a).) Two prior nonserious, nonviolent felony convictions were alleged as one-year prior prison term enhancements. (Pen. Code, § 667.5, subd. (b).) After a bifurcated nonjury trial, the trial court found these allegations true.

Defendant was sentenced to a total indeterminate term of 56 years 8 months to life in prison.

## III

## COLLATERAL ESTOPPEL

Defendant contends that his acquittal of felony murder at the first trial operates as collateral estoppel so as to bar his prosecution for robbery at the second trial.

■ The doctrine of collateral estoppel is a "component" of the double jeopardy clause of the Fifth Amendment. (*People v. Catlin* (2001) 26 Cal.4th 81, 123–124 [109 Cal.Rptr.2d 31, 26 P.3d 357].) "[C]ollateral estoppel bars relitigation of an issue decided at a previous trial 'if (1) the issue necessarily decided at the previous trial is identical to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial.' [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 163 [115 Cal.Rptr.2d 614, 38 P.3d 461], quoting *People v. Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622].)

Preliminarily, the People argue that defendant waived his present contention by failing to raise it below. They are correct. ■ Failure to plead double jeopardy in the trial court constitutes a waiver. (*People v. Belcher* (1974) 11 Cal.3d 91, 96 [113 Cal.Rptr. 1, 520 P.2d 385]; see Pen. Code, §§ 1017, 1041.) Similarly, collateral estoppel is waived if not raised in the trial court. (*People v. Neely* (1999) 70 Cal.App.4th 767, 782–783 [82 Cal.Rptr.2d 886]; *People v. Gillard* (1997) 57 Cal.App.4th 136, 160 [66 Cal.Rptr.2d 790].)

Defendant, however, also contends, in the alternative, that his trial counsel rendered ineffective assistance by failing to raise double jeopardy below as a bar to the retrial. If, indeed, double jeopardy applied, we can conceive of no legitimate tactical reason for failing to raise it. Accordingly, regardless of whether the defense was waived, we must decide whether it had merit. (*People v. Burgener* (2003) 29 Cal.4th 833, 887 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Marshall* (1996) 13 Cal.4th 799, 824, fn. 1 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

The leading case is *Ashe v. Swenson* (1970) 397 U.S. 436 [90 S.Ct. 1189, 25 L.Ed.2d 469]. There, six men playing poker were robbed. The defendant was charged with the robbery of Knight, one of the poker players. (*Id.* at p. 437.) At trial, the evidence that there had been a robbery was "unassailable," but the evidence that the defendant had been one of the robbers was "weak." (*Id.* at p. 438.) The defendant was acquitted. (*Id.* at p. 439.) The defendant was then charged with the robbery of Roberts, a second poker player. (*Ibid.*) This time, he was tried and convicted. (*Id.* at pp. 439–440.)

The Supreme Court began by holding that federal collateral estoppel principles would have barred the second trial. "[T]he rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' [Citation.]" (*Ashe v. Swenson, supra*, 397 U.S. at p. 444, fn. omitted, quoting *Sealfon v. U.S.* (1948) 332 U.S. 575, 579 [92 L.Ed. 180, 68 S.Ct. 237].) "[T]he record is utterly devoid of any indication that the first jury could rationally have found that an armed robbery had not occurred, or that Knight had not been a victim of that robbery. The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not." (*Ashe,* at p. 445.)

The court then also held that these collateral estoppel principles were "embodied in the Fifth Amendment guarantee against double jeopardy." (*Ashe v. Swenson, supra*, 397 U.S. at p. 445.) "Once a jury had determined upon conflicting testimony that there was at least a reasonable doubt that the petitioner was one of the robbers, the State could not present the same or different identification evidence in a second prosecution for the robbery of Knight in the hope that a different jury might find that evidence more convincing. The situation is constitutionally no different here, even though the second trial related to another victim of the same robbery." (*Id.* at p. 446.)

The People argue that collateral estoppel does not apply here because defendant was not subject to successive prosecutions. Rather, after the mistrial on the robbery counts in his first trial, he was retried in the same prosecution. Ordinarily, collateral estoppel requires "a final judgment on the merits . . . ." (*People v. Lawley, supra*, 27 Cal.4th at p. 163; accord, *Ashe v. Swenson, supra*, 397 U.S. at p. 443.) "The high court has never suggested [collateral estoppel] applies to the same proceeding. Indeed, it has consistently stated it applies to 'successive prosecutions.' [Citation.]" (*People v. Santamaria* (1994) 8 Cal.4th 903, 913 [35 Cal.Rptr.2d 624, 884 P.2d 81], quoting *Brown v. Ohio* (1977) 432 U.S. 161, 167, fn. 6 [L.Ed.2d 187 97 S.Ct. 2221, 53].) In *Ashe* itself, for example, the defendant's acquittal in his first trial for robbery was a final judgment on the merits.

On the other hand, plain vanilla double jeopardy, *not* based on collateral estoppel, *can* bar a second trial in the same prosecution. (E.g., *Burks v. U.S.*

(1978) 437 U.S. 1, 11–12 [98 S.Ct. 2141, 57 L.Ed.2d 1] [conviction in first trial reversed for insufficiency of the evidence]; *People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 71–78 [2 Cal.Rptr.2d 389, 820 P.2d 613] [conviction in first trial of murder, without fixing degree, reversed for other reasons on appeal]; *Curry v. Superior Court* (1970) 2 Cal.3d 707, 712 [87 Cal.Rptr. 361, 470 P.2d 345] [mistrial in first trial granted without legal necessity].) Moreover, finality for purposes of collateral estoppel is a somewhat elastic concept. (See Rest.2d Judgments, § 13.) Other state courts have suggested that, even in a single prosecution, a jury's findings in a first trial can operate as collateral estoppel so as to bar a second trial. (*State v. Handley* (Mo. 1979) 585 S.W.2d 458, 463–465 [plur. opn.], overruled on other grounds in *State v. Wilkerson* (Mo. 1981) 616 S.W.2d 829, 833; *People v. Garcia* (1995) 448 Mich. 442, 483 [531 N.W.2d 683] [opn. for affirmance; affd. by 2-2 vote].)

Even one of our sister courts has so held. In *People v. Asbury* (1985) 173 Cal.App.3d 362 [218 Cal.Rptr. 902], a jury found the defendant guilty of first degree murder and robbery; however, it found a robbery-murder special circumstance not true. These convictions were reversed on appeal. (*Id.* at p. 364.) On remand, the defendant was again convicted of first degree murder, which was presented to the jury exclusively on a felony-murder theory, and robbery. (*Id.* at pp. 364–365.) The court held that the first jury's not-true finding on the robbery-murder special circumstance operated as collateral estoppel so as to bar a second trial on a felony-murder theory. (*Id.* at pp. 365–366.)

Admittedly, the *Asbury* court did not expressly consider whether the first jury's finding was sufficiently final to be given collateral estoppel effect. "[I]t is axiomatic that cases are not authority for propositions not considered. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176 [119 Cal.Rptr.2d 903, 46 P.3d 372].) Nevertheless, *Asbury* and the other authorities we have cited show that whether collateral estoppel can apply within a single prosecution is a difficult and unsettled question. We therefore choose not to decide it. Instead, we will assume the first jury's verdict acquitting defendant of murder was sufficiently final to act as collateral estoppel. We therefore turn to the question of whether, even on that assumption, it barred defendant's retrial for robbery.

A criminal defendant who asserts "constitutional collateral estoppel" has the "burden of establishing the factual predicate for the application of the doctrine . . . ." (*Schiro v. Farley* (1994) 510 U.S. 222, 232 [, 127 L.Ed.2d 47 114 S.Ct. 783].) Ordinarily, we must presume the first jury acted rationally. (See *id.* at p. 233; *Ashe v. Swenson, supra*, 397 U.S. at p. 444.) " ' "The mere possibility that the jury acted irrationally, without more, will not negate the

collateral estoppel effects of a prior verdict if a rational interpretation of the verdict as a whole is possible." [Citation.]' " (*U.S. v. Romeo* (9th Cir. 1997) 114 F.3d 141, 144, quoting *Pettaway v. Plummer* (9th Cir. 1991) 943 F.2d 1041, 1046.) This presumption, however, can be overcome if the record shows that the jury did, in fact, act irrationally or inconsistently. (*U.S. v. Marino* (1st Cir. 1999) 200 F.3d 6, 11, cert. den. (2000) 529 U.S. 1137 [146 L.Ed.2d 969, 120 S.Ct. 2022].)

Here, in the first trial, the jury was instructed on murder under both a malice theory and a felony-murder theory. It was also instructed, however, that defendant—unlike Flores and Moreno—could be found guilty solely under a felony-murder theory. In any event, regardless of whether the jury even considered other theories as to defendant, by acquitting him, it necessarily rejected the felony-murder theory.

In principle, the jury's verdict could mean that any or all of the elements of felony murder were not proven beyond a reasonable doubt. For example, it could mean that Ralph was not killed; that there was not a robbery or burglary; that the killing did not occur during any such robbery or burglary; or that defendant did not have the specific intent to commit robbery or burglary. (See CALJIC No. 8.21.)

In practice, however, it would be absurd to suppose that the jury doubted that Ralph was killed—particularly as it found Flores and Moreno guilty of second degree murder. Similarly, on this record, *if* the jury found that there was a robbery, it would scarcely have doubted that the killing took place during that robbery. It may have doubted that there was a robbery at all. Alternatively, it may have doubted that defendant had the specific intent to commit robbery. ■ Robbery, however, requires the specific intent to permanently deprive. (*People v. Butler* (1967) 65 Cal.2d 569, 572–573 [55 Cal.Rptr. 511, 421 P.2d 703], disapproved on other grounds in *People v. Tufunga* (1999) 21 Cal.4th 935, 956 [90 Cal.Rptr.2d 143, 987 P.2d 168].) Accordingly, construing the acquittal alone, it would seem that, for whatever reason, the jury did not believe that defendant participated in a robbery.

But there is one problem—the jury also deadlocked on the two robbery counts against defendant. It makes no sense that all twelve jurors could unanimously agree that defendant was not committing a robbery for purposes of the murder count, yet could not agree on this for purposes of the robbery counts. Moreover, the jury found true the gang enhancement to the murder count—that is, it found that defendant committed the murder for the benefit of a gang, even though it acquitted him of the same murder! We conclude that the first jury's verdicts were inconsistent on the issue of whether defendant committed robbery.

As we will discuss in more detail, the United States Supreme Court has repeatedly held that, when an acquittal is accompanied by other, inconsistent verdicts, it is not entitled to collateral estoppel effect. (*U.S. v. Powell* (1984) 469 U.S. 57, 68 [105 S.Ct. 471, 83 L.Ed.2d 461]; *Standefer v. U.S.* (1980) 447 U.S. 10, 23, fn. 7 [64 L.Ed.2d 689 100 S.Ct. 1999, ].)

In *Standefer*, the defendant allegedly paid for five vacations taken by Niederberger, an Internal Revenue Service agent. (*Standefer v. U.S.*, *supra*, 447 U.S. at p. 11.) In a prior proceeding, Niederberger had been charged with 10 counts—i.e., one count of accepting an illegal gratuity (18 U.S.C. § 201(g)) and one count of accepting unlawful compensation (26 U.S.C. § 7214(a)(2)) as to each of the five vacations. (*Standefer*, at p. 12.) Niederberger was convicted on four counts of accepting an illegal gratuity, but acquitted on the fifth; he was convicted on two counts of accepting unlawful compensation, but acquitted on the other three. (*Id.* at pp. 12–13.)

Thereafter, the defendant was charged with nine counts—i.e., one count of offering an illegal gratuity (18 U.S.C. § 201(f)) and one count of aiding and abetting the acceptance of unlawful compensation (18 U.S.C. § 2; 26 U.S.C. § 7214(a)(2)) as to each of the five vacations (minus one count which was barred by the statute of limitations). (*Standefer v. U.S.*, *supra*, 447 U.S. at pp. 11–12 and 12, fn. 3.) He was convicted on all nine counts. (*Id.* at p. 13.)

The Supreme Court held that, as a matter of collateral estoppel, the acquittal of the perpetrator does not bar the conviction of an aider and abettor. (*Standefer v. U.S.*, *supra*, 447 U.S. at pp. 21–25.) In the bulk of its opinion on this point, it explained that the policy considerations behind offensive nonmutual collateral estoppel did not apply in this situation. In a footnote, however, it also noted that the verdicts in Niederberger's case had been inconsistent: As to two of the vacations, Niederberger had been convicted of accepting an illegal gratuity, but acquitted of accepting unlawful compensation. (*Id.* at p. 23, fn. 17.) The court concluded: "No explanation has been offered for these seemingly irreconcilable determinations. *This inconsistency is reason, in itself, for not giving preclusive effect to the acquittals on the[se two] counts.*" (*Ibid.*, italics added.)

In *Powell*, the defendant was charged with a drug offense and with conspiracy to commit the same drug offense (collectively, the predicate offenses). Among the overt acts alleged to support the conspiracy charge were four telephone conversations in which the defendant had participated. The defendant was also charged with four separate counts—one for each of the four telephone conversations—of using a telephone to commit the predicate offenses (collectively, the compound offenses). A jury acquitted the defendant

of the predicate offenses and of one of the compound offenses; it found her guilty on the other three compound offenses. (*U.S. v. Powell, supra,* 469 U.S. at pp. 60–61.)

On appeal, the defendant argued that the verdicts were inconsistent. (*U.S. v. Powell, supra,* 469 U.S. at p. 60.) The intermediate appellate court agreed. It held that the defendant could not have used a telephone to commit the predicate offenses without actually committing the predicate offenses. Hence, her acquittal of the predicate offenses was inconsistent with her convictions on the compound offenses. (*Id.* at p. 61.)

The Supreme Court accepted that the verdicts were inconsistent. It held, however, that a conviction by a jury on one count may stand even though it is inconsistent with an acquittal by the same jury on another count. (*U.S. v. Powell, supra,* 469 U.S. at pp. 62–69.) In the course of so holding, the court stated: "[A]n argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense . . . necessarily assumes that the acquittal on the predicate offense was proper—the one the jury 'really meant.' This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent. The Government could just as easily—and erroneously—argue that since the jury convicted on the compound offense the evidence on the predicate offense must have been sufficient. The problem is that the same jury reached inconsistent results; once that is established principles of collateral estoppel—which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict—are no longer useful." (*Id.* at p. 68.)

In both *Standefer* and *Powell,* the jury actually returned inconsistent verdicts. It could be argued that this case is distinguishable because here, the jury deadlocked on the robbery counts; thus, it did not actually return a verdict on them. *Ashe,* however, dictates a pragmatic approach; we are to examine the entire record to determine what the jury meant by the verdicts it *did* return. ■ Given its deadlock on the robbery counts, we cannot say that the verdict acquitting defendant of murder reflects a finding that defendant did not commit robbery. Moreover, as noted, the jury did return a verdict finding the gang enhancement to the murder count to be true. Thus, as in *Standefer* and *Powell,* it *did* return inconsistent verdicts. We conclude that its verdict acquitting defendant of felony murder is not collateral estoppel on the issue of defendant's guilt of robbery.

A Missouri state court came to an identical conclusion in *State v. Johnson* (Mo. 1980) 598 S.W.2d 123. There, the defendant was charged with first degree murder and robbery. The only theory of first degree murder presented to the jury was felony murder. The jury acquitted him of murder but

deadlocked on robbery. He was retried on the robbery charge and convicted. (*Id.* at p. 125.) The court held that collateral estoppel did not bar the second trial: "The crucial question on the collateral estoppel issue is: What issues does a general verdict of acquittal of felony-murder resolve? [Citation.] It cannot be convincingly argued that the jury's acquittal of the murder charge impliedly acquitted appellant of the robbery, as in *Ashe* . . . . Distinguishing this case from *Ashe* is the fact that here it cannot be said that there was only a 'single rationally conceivable issue in dispute before the jury.' [Citation.] In light of the inability of the jury in the [first] trial to return a verdict on the robbery charge, we conclude that its acquittal of murder under the felony-murder doctrine was for a reason, or on an issue, not related to robbery." (*Id.* at pp. 125–126, quoting *Ashe v. Swenson, supra,* 397 U.S. at p. 445.)

Besides relying on the federal Constitution and *Ashe,* defendant also alludes, in passing, to California's constitutional and statutory guarantees against double jeopardy. (Cal. Const., art. I, § 15; Pen. Code, § 1023.) "Under California law, in some instances, an accused may be entitled to greater double jeopardy protection than that afforded under the federal Constitution. [Citations.]" (*People v. Fields* (1996) 13 Cal.4th 289, 302 [52 Cal.Rptr.2d 282, 914 P.2d 832].) Defendant, however, does not suggest, nor do we perceive, any reason why that should be true in this case.

For the sake of completeness, we note that defendant also contends that collateral estoppel barred a retrial of the gang/vicarious firearm discharge/great bodily injury enhancements. These enhancements applied if, among other things, (1) defendant was a principal in the charged robbery, and (2) a principal in the robbery personally discharged a firearm, causing great bodily injury. (Pen. Code, § 12022.53, subds. (d), (e).) Defendant argues that, by acquitting him of murder, the first jury necessarily determined that he was not a principal in any robbery. Once again, however, because that jury deadlocked on the robbery charges, defendant cannot carry his burden of proving that it made any such determination.

For these reasons, we conclude that collateral estoppel did not bar defendant's retrial for robbery and attempted robbery, nor did it bar the retrial of the firearm enhancements to the robbery and attempted robbery charges.

## IV

### THE SUFFICIENCY OF THE EVIDENCE OF AIDING AND ABETTING[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante,* page 1176.

## V

## FALSE TESTIMONY OF VIRGEN

Defendant contends Virgen's testimony was perjurious, and therefore the prosecutor committed misconduct by presenting it.

### A. *Additional Factual and Procedural Background.*

As noted, Joe Virgen was the only percipient witness who denied that there was a drug deal going on when the shooting occurred. In closing argument, the prosecutor said: "Richard Avila came in and told you the truth. Joe Virgen came in and told you no, there was no drug deal. And the important thing to remember about that is[,] who picked Joe Virgen to be a witness here? I certainly didn't want Joe Virgen to be my witness. I don't like putting up people in front of you who come in and don't tell you the truth about what really happened as far as the drug deal. I didn't choose Joe Virgen as a witness. Who chose Joe Virgen? The defendant did. . . . When the defendant decided to rob Joe Virgen, Richard Avila, and ·Ralph Avila, he chose who would come in and have to testify about that."

### B. *Prosecutorial Misconduct.*

██ Defendant did not object to the asserted prosecutorial misconduct at trial. Accordingly, he waived it for purposes of appeal. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1253 [74 Cal.Rptr.2d 212, 954 P.2d 475] [claim that prosecutor presented perjurious testimony]; *People v. Marshall, supra,* 13 Cal.4th at pp. 830–831 [same].)

Separately and alternatively, there was no misconduct.

"Due process is denied when a prosecutor knowingly uses perjured testimony to obtain a conviction. [Citations.] Originally, under the traditional rule, to obtain relief a defendant had to establish by a preponderance of the evidence that perjured testimony was adduced at his trial, that representatives of the state knew of its falsity, and that such testimony may have affected the outcome of the trial. [Citations.]" (*People v. Marshall, supra,* 13 Cal.4th at pp. 829–830.) As a result of statutory changes, in a habeas corpus proceeding, the defendant no longer has to show that the prosecutor knew the testimony was false. (*In re Hall* (1981) 30 Cal.3d 408, 424 [179 Cal.Rptr. 223, 637 P.2d 690].) It is not entirely clear whether this same new rule also applies on direct appeal. (Compare *Marshall,* at p. 829 [dictum: defendant need not show falsity, citing habeas cases] with *People v. Musselwhite, supra,* 17 Cal.4th at p. 1253 [rejecting claim because prosecutor did not know testimony was

false].) We need not decide whether knowledge is required, because here, any requisite knowledge was shown by the prosecutor's participation in the first trial and by his concession in his closing argument.

 The prosecution has the "basic duty . . . to correct any testimony of its own witnesses which it knew . . . was false or misleading. [Citations.]" (*In re Jackson* (1992) 3 Cal.4th 578, 595 [11 Cal.Rptr.2d 531, 835 P.2d 371], italics omitted; accord, *People v. Seaton* (2001) 26 Cal.4th 598, 647 [110 Cal.Rptr.2d 441, 28 P.3d 175].) Thus, if the prosecutor discloses fully the falsity of the testimony, there is no due process violation. (See *People v. Gordon* (1973) 10 Cal.3d 460, 474 [110 Cal.Rptr. 906, 516 P.2d 298] ["[i]n his statement the prosecutor made it clear that Carolyn's credibility as a witness was suspect"]; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1181–1182 [96 Cal.Rptr.2d 1, 998 P.2d 969] ["[a]llowing both Edwards and defendant to testify subject to cross-examination and impeachment by available evidence, as was done here, afforded defendant a fair trial and comported with due process"].) In that event, it can no longer be said that the prosecutor "used" the false testimony to obtain a conviction. Moreover, the correction prevents the false testimony from influencing the outcome of the trial. It could even be argued that the witness's testimony—taken as a whole, and in light of the whole record—no longer gives the jury a false impression.

A workable rule, not inconsistent with United States Supreme Court precedents, would be that presenting false evidence does not violate due process; the violation consists of failure to disclose whatever other evidence there may be that the evidence presented is false. Such a rule is implied by the principle in habeas corpus proceedings that merely alleging that the prosecution presented perjured testimony is insufficient. "An application for habeas corpus on the ground of perjured testimony must not only set forth the facts that prove perjury . . . , but must also show that those facts existed independently of the contradictions appearing at the trial. [Citation.] It must also appear that the petitioner had no opportunity to present the alleged true matter at the trial; that is, that there was such suppression of the truth by the authorities that he was precluded from discovering it and using it at the trial. [Citations.]" (*In re Waltreus* (1965) 62 Cal.2d 218, 221 [42 Cal.Rptr. 9, 397 P.2d 1001].)

Presenting both sides of the story does not interfere with a fair trial; quite the opposite, it allows the jury to fulfill its role as fact finder. By contrast, a rule that the prosecution violates due process by presenting "false" testimony, even if it also presents the "truth," forces the prosecutor to usurp the jury's role—to determine truth and falsity before there has even been a trial. (See *People v. Seaton, supra,* 26 Cal.4th at p. 648 ["[s]o long as the prosecutor's doubts are *based solely on the evidence presented at trial,* the jury is capable

of deciding which of the competing [witnesses] is the more convincing, and the prosecutor's views have no bearing on that decision"].) Here, however, we need not go so far. The prosecutor not only presented to the jury the evidence that Virgen was lying; he also disclosed fully to the jury his own personal disbelief of Virgen's testimony. Hence, there was no due process violation.

Defendant understandably relies on *U.S. v. LaPage* (9th Cir. 2000) 231 F.3d 488. There, the court held that the prosecutor's presentation of false evidence required reversal, even though the prosecutor had eventually conceded, in closing argument, that the evidence was false. Defendant LaPage had obtained a loan through Manes, a loan broker. LaPage signed a false tax return which Manes delivered to the bank. Manes received "almost all" of the loan proceeds as his commission. (*Id.* at p. 489.) Manes—"the prosecution's star witness"—testified that he told LaPage that the tax return was false and that signing it was the only way he could get the loan. The defense argued that LaPage had been Manes's "innocent dupe . . . ." (*Id.* at p. 490.)

According to Manes, the return had been prepared by an accountant named Pinkston. Pinkston testified that she had had nothing to do with it and that her signature on it was forged. At the defendant's previous trial, Pinkston walked into the courtroom, and Manes was asked if he recognized her; he said he did not. That trial ended with a hung jury. When the case was retried, Manes testified that, when Pinkston walked into the courtroom at the previous trial, he recognized her and identified her. (*U.S. v. LaPage, supra*, 231 F.3d at p. 490.) Defense counsel attempted to impeach Manes by introducing the transcript of the previous trial; however, it did not reflect *whom* in the courtroom Manes had failed to recognize. (*Id.* at p. 490 and fn. 5.) In his closing argument, the prosecutor argued that Manes was credible. (*Id.*, at p. 490.) On rebuttal, he finally admitted that Manes actually had not recognized Pinkston; he argued, however, that Manes had simply misremembered recognizing her and, moreover, had admitted that he was not sure. (*Id.* at pp. 490–491 and fn. 6.) The jury found LaPage guilty of making false statements to a bank to obtain a loan. (*Id.* at p. 489.)

The appellate court held: "Because the use of known lies to get a conviction deprives a defendant of his constitutional right to due process of law, we must reverse LaPage's conviction unless Manes's false testimony was 'harmless beyond a reasonable doubt.' " (*U.S. v. LaPage, supra*, 231 F.3d at p. 491, fn. omitted.) It found that the evidence of LaPage's guilt was weak, particularly as he had gotten virtually none of the loan proceeds. It concluded that "if the jury had clearly understood that Manes had lied to them about recognizing Pinkston, there is a 'reasonable likelihood' that the jurors would have had a reasonable doubt about LaPage's guilt." (*Ibid.*)

The court also noted: "The government correctly argues that there was other evidence from which the jury could have figured out that Manes had lied about Pinkston and other matters, and that the defense knew as plainly as the prosecutor that Manes had lied. But the government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false. Where the prosecutor knows that his witness has lied, he has a constitutional duty to correct the false impression of the facts. . . . Only after the defense has used up its last chance to address the jury in closing argument did the prosecutor concede on rebuttal that Manes had lied about Pinkston. Though making the concession, the prosecutor argued that Manes's lie about Pinkston was not about anything important so it should not affect the verdict. Because the prosecutor delayed the correction until rebuttal argument, the defense could no longer explain why the lie about Pinkston was important." (*U.S. v. LaPage, supra,* 231 F.3d at pp. 491–492, fn. omitted.)

We do not believe *LaPage* stands for the sweeping proposition that due process is violated *whenever* a prosecution witness gives false testimony, *regardless* of the prosecutor's efforts to correct the falsity. If it could be read so broadly, we would be forced to disagree with it. In light of its facts, however, it is distinguished significantly from this case. In *LaPage*, the other evidence in the case failed to make it clear to the jury that Manes had lied. Although the prosecutor did eventually concede that Manes had lied, he did so belatedly and inadequately.

Here, by contrast, all of the other eyewitnesses agreed that a drug deal was going on. If so, Virgen had to be lying. This would have been obvious to the jury. The prosecutor conceded early in his closing argument—not on rebuttal—that Virgen had lied. He did not try to minimize the lie or to label it an innocent misrecollection. Defense counsel could and did argue that Virgen was "an unmitigated liar." Defendant does not suggest any way in which the jury's ability to perform its functions—to resolve credibility disputes and to find the facts—was compromised so as to render the trial unfair.

Moreover, defendant cannot show that Virgen's testimony was, in fact, false. "The mere fact that the statement of a witness is . . . contradicted by an opposing witness does not establish that the first witness' testimony was perjured, . . . even if testimony of the latter witness may appear more reliable." (*People v. Farris* (1977) 66 Cal.App.3d 376, 385 [136 Cal.Rptr. 45].) Likewise, the prosecutor's concession in closing argument cannot be used to show that Virgen's testimony was false. (*People v. Gordon, supra,* 10 Cal.3d at p. 474.) This makes some sense. If the prosecutor has presented truthful testimony under the mistaken belief that it was false, the defendant has nevertheless received a fair trial.

Virgen's testimony was not physically impossible or otherwise demonstrably false. Indeed, there was some evidence that he was telling the truth. When the police arrived, they did not find any drugs or drug paraphernalia. After defendant was arrested, he sent a note telling a friend to ask Virgen "to say [I] never had no gun & wasn't robbing him. That we were in the bedroom doing a drug deal . . . . Also how much dope or money does [Virgen] want for helping[] us?" When the police first questioned Richard, he did not say anything about a drug deal. Thus, it would be one reasonable view of the evidence that defendant tried to get both Richard and Virgen to lie and to say that there was a drug deal; he succeeded with Richard, but failed with Virgen, who testified truthfully.

In both respects—the prosecution's full disclosure of the falsity, and the defendant's inability to demonstrate actual falsity—this case is on all fours with *People v. Gordon, supra,* 10 Cal.3d 460. There, witness Carolyn Thorin testified that the defendant shot and killed her fiance. (*Id.* at p. 464.) The defendant testified that Carolyn was the actual killer. (*Id.* at pp. 465–466.) In his opening statement, the prosecutor told the jury that he believed that Carolyn had been "involved," even though defendant had indeed been the shooter; he cautioned that Carolyn was "not going to tell you the truth" and was instead going to tell "a half-truth story . . . ." (*Id.* at pp. 467, 472.)

On appeal, the defendant argued that the prosecution had knowingly used perjured testimony. (*People v. Gordon, supra,* 10 Cal.3d at p. 473.) The Supreme Court disagreed: "[T]he prosecutor made it clear that Carolyn's credibility as a witness was suspect. In effect, he was presenting her testimony with a full admonition of its doubtful veracity, so that the jury could decide for itself which of the conflicting versions of the incidents in question was true. . . . Moreover, defendant makes no showing that any of Carolyn's testimony was in fact perjured. . . . [I]t is significant that Carolyn was the only person other than defendant who knew what actually occurred. The parties to litigation generally cannot choose all their witnesses; some are forced upon them by circumstance. We conclude, therefore, the prosecution's presentation of Carolyn's testimony did not constitute a denial of due process. [Citation.]" (*Id.* at p. 474, fn. omitted.)

*Gordon* requires us to reject defendant's contention. We conclude that defendant cannot show that the prosecution violated due process by using false testimony to secure a conviction.

C. *Virgen's Testimony as Substantial Evidence.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

───────────────

[*]See footnote, *ante,* page 1176.

## VI

### THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE GANG ENHANCEMENTS

Defendant contends the evidence was insufficient to support the jury's true findings on the gang enhancements. (Pen. Code, § 186.22, subd. (b).)

A gang enhancement does not apply unless the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (Pen. Code, § 186.22, subd. (b)(1).)

Deputy Skahill was asked to assume the critical facts of this case. He was then asked whether, in his opinion, such hypothetical crimes were committed for the benefit of, at the direction of, and/or in association with a criminal street gang. He testified that they were. He explained that they involved three gang members acting in association with each other. The gang provided "a ready-made manpower pool . . . ." That is, one gang member would choose to commit a crime in association with other gang members because he could count on their loyalty. They would "watch his back . . . ." In addition, the very presence of multiple gang members would be intimidating. The crime would benefit the individual gang members with notoriety among the gang, and the gang with notoriety among rival gang members and the general public.

Defendant argues: "[Deputy Skahill] did not testify that this specific crime was committed for the benefit of a street gang. . . . According to [his] testimony, any crime committed by any gang member would satisfy this element because all crime serves as 'notoriety' for the gang. . . . There was no evidence that [defendant] committed this particular crime with the specific intent to promote, or further a criminal street gang."

This is not an entirely accurate summary of Deputy Skahill's testimony. He focused on a crime committed, not just by a gang member, but by several gang members, acting in association with each other. Also, he did not testify that such a crime necessarily would benefit the gang, merely that it would be committed *either* for the benefit of, *or* at the direction of, *or* in association with the gang. Finally, he did not testify that defendant necessarily would have had "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."

Subject to these caveats, Deputy Skahill did testify that *any* such crime would satisfy the benefit/direction/association element. This testimony nevertheless was relevant to defendant's *particular* crimes. He had just been asked

to assume the facts of these crimes as the basis of his opinion. Moreover, logically, if any such crime satisfies this element, then so did defendant's crimes. If all men are mortal, then Socrates, being a man, is mortal.

Defendant argues that reliance on evidence that one gang member committed a crime in association with other gang members is "circular . . . ." Not so. Arguably, such evidence alone would be insufficient, even when supported by expert opinion, to show that a crime was committed for the *benefit* of a gang. The crucial element, however, requires that the crime be committed (1) for the benefit of, (2) at the direction of, *or* (3) in *association* with a gang. Thus, the typical close case is one in which one gang member, acting alone, commits a crime. Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang. Here, however, there was no evidence of this. Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members.

If defendant is arguing that there was insufficient evidence of the specific intent element (as opposed to the benefit/direction/association element), we disagree. Again, specific intent to *benefit* the gang is not required. What is required is the "specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." Here, there was evidence that defendant intended to commit robberies, that he intended to commit them in association with Flores and Moreno, and that he knew that Flores and Moreno were members of his gang. Moreover, as we held in part IV, *ante*, there was sufficient evidence that defendant intended to aid and abet the robberies Flores and Moreno actually committed. It was fairly inferable that he intended to assist criminal conduct by his fellow gang members.

Defendant asserts that evidence that he intentionally performed acts which aided and abetted his codefendants, even when combined with evidence that he knew their intent, falls short of proving that he shared that intent. He cites *People v. Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318]. *Beeman* held that in an aiding and abetting case it is insufficient to instruct the jury to find that the defendant merely *knew* the perpetrator's intent. (*Id.* at p. 560.) It acknowledged, however, that *ordinarily*, " 'from a person's action with knowledge of the purpose of the perpetrator of a crime, his intent to aid the perpetrator can be *inferred*. In the absence of evidence to the contrary, the intent may be regarded as established.' " (*Id.* at p. 558, quoting *People v. Yarber* (1979) 90 Cal.App.3d 895, 916 [153 Cal.Rptr. 875].) It simply held that " 'we cannot extrapolate therefrom, as a matter of law, that the inference *must* be drawn.' " (*Beeman*, at p. 557, quoting *Yarber*, at p. 916.) *Beeman* therefore actually supports our conclusion that defendant's intentional acts,

when combined with his knowledge that those acts would assist crimes by fellow gang members, afforded sufficient evidence of the requisite specific intent.

We conclude that there was sufficient evidence to support the jury's finding that the gang enhancements were true.

## VII–XI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## XII

## DISPOSITION

The judgment is affirmed.

Hollenhorst, Acting P. J., and Ward, J., concurred.

On November 6, 2003, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 4, 2004. George, C. J., did not participate therein.

---

*See footnote, *ante*, page 1176.