Filed 4/29/13  P. v. Martinez CA4/2
Opinion on remand from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAMSON MARTINEZ,<br><br>    Defendant and Appellant. | E054731<br><br>(Super.Ct.No. INF10000762)<br><br>**OPINION ON REMAND** |

APPEAL from the Superior Court of Riverside County.  Edward Forstenzer, Judge.  (Retired judge of the Mono Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part and reversed in part with directions.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Collette Cavalier and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

1

On April 6, 2010, defendant Samson Martinez, a True Crimes Boy (TCB) gang member, was driving around Desert Hot Springs with several friends. They drove by a crowd of people whom defendant identified to his cohorts as members of a rival gang called West Drive Locos or West Drive. Defendant shot into the crowd of gang members. A short time later, Marcos Mendez, a documented West Drive gang member, went into the Desert Hot Springs police station with a gunshot wound to his arm. Defendant was convicted of attempted murder with several weapons use and gang allegations being found true.

On appeal, defendant argues that (1)The evidence did not establish that anyone was hurt during the drive-by shooting or that Mendez was present in the crowd that was shot upon to support his conviction of the enhancements found true pursuant to Penal Code sections 12022.7, subdivision (a) and 12022.53, subdivision (d);[1] (2) The trial court erred by denying his section 1118.1 motion, as insufficient evidence of great bodily injury to Mendez was shown by the People's case-in-chief; and (3) There was insufficient evidence of the gang enhancements found true under section 186.22, subdivisions (a) and (b)(1), as he acted alone, without the assistance of any fellow TCB gang members.

In our original opinion, filed November 30, 2012, we rejected all of defendant's arguments and affirmed the judgment. Based on case law relevant at the time of the opinion that a perpetrator of a crime need not be with another gang member when committing a crime in order to be convicted of the substantive gang crime, we concluded that sufficient evidence supported his convictions of section 186.22, subdivisions (a) and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

(b)(1). We acknowledged that the issue was pending review in the California Supreme Court.

Defendant petitioned for review to our Supreme Court. By its order of March 13, 2013, the Supreme Court granted defendant's petition and directed that we vacate our decision and "reconsider the cause in light of *People v. Rodriguez* (2012) 55 Cal.4th 1125," (*Rodriguez*). We have examined *Rodriguez* and find that defendant's conviction of violating section 186.22, subdivision (a) should be reversed. In all other respects, our original disposition remains unchanged.

I

PROCEDURAL BACKGROUND

Defendant was convicted by a jury of one count of attempted murder (§§ 664/187). The jury found true the allegations that in the commission of the crime defendant personally and intentionally discharged a firearm and proximately caused great bodily injury or death to another person (§ 12022.53, subd. (d)); he committed the offense for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in any criminal conduct by gang members (§ 186.22, subd. (b)(1)); and he caused great bodily injury (§12022.7, subd. (a)). Defendant was also found guilty of the substantive crime of street terrorism. (§ 186.22, subd. (a).)

Defendant was sentenced to 7 years for the attempted murder, plus 25 years to life pursuant to section 12022.53, subdivision (d). Sentence on the remaining allegations was stayed. He received a total sentence in state prison of 32 years to life.

3

## II

## FACTUAL BACKGROUND

A.      *People's Case-in-Chief*

   1.      *Witnesses in the car with defendant*

On April 6, 2010, C.R. was 15 years old.  Daivon Johnson[2] was a close friend of

C.R.'s.  Johnson was also friends with William Shack.  C.R., Shack, and Johnson all

knew defendant as "Doughboy."

The three presented differing stories as to what occurred prior to the shooting of

the West Drive gang members.  Shack said he drove to Johnson's house in Desert Hot

Springs.  Defendant was at the house along with C.R. and Johnson, but Shack later

testified that they picked defendant up off of the street.  Johnson said they all got in the

car at Johnson's house and then went to a couple of stores.

C.R. indicated that he, defendant, Johnson, and Shack went target shooting in the

desert either before or after the shooting.  They had one gun with them, which was a .22

caliber.  Johnson carried the gun for protection.  Only C.R. was shooting.  C.R. indicated

they then went to the gun store to buy ammunition and were heading to C.R.'s house

when defendant told them to go somewhere else.  They disagreed whether they went to

buy beer before or after the shooting.

They all agreed, however, about how the shooting occurred.  Shack was in the

driver's seat, Johnson was in the passenger's seat, C.R. was behind Shack, and defendant

---

   **2**      Johnson was unavailable for trial, and his preliminary hearing testimony
was read into the record.  He had a prior felony conviction.

was behind Johnson. They were driving down Hacienda Avenue in Desert Hot Springs when defendant told Shack to turn down Via Real Street. Defendant saw a group of what he called "wet dicks," which was a derogatory name for West Drive members. Johnson heard defendant call them West Drive. C.R. described the group as "gang banger-type." There were 7 to 10 of them, there were older and younger men, and they were all Hispanic. C.R. knew some of the younger men in the crowd. One of them was named Ruben, who was known as Negro, and another was known as Little One. Shack indicated that there were "like . . . five" people in the group that was shot at, and they were a mixture of races. Johnson indicated that there were four or five Hispanic males in the group of what appeared to be teenagers.

As they drove by, defendant opened up the back passenger's side door, hung out the door by the seatbelt, and started shooting with his own gun. Shack heard more than three shots fired. He did not stop the car. Johnson heard six to seven gunshots and said the gun was brown and black. It looked like a revolver. C.R. described the gun that defendant used as a .357 revolver. He heard defendant say under his breath after the shooting, "I got those fuckers."

C.R. stated that they dropped off defendant at an apartment complex called Country Hills, which was near where the shooting had occurred. Defendant took the gun with him. Shack indicated that defendant was dropped off at one of the stores where they went to buy beer. Johnson stated that defendant was dropped off within two or three minutes after the shooting in front of some apartments.

Shack and Johnson were mad at defendant about the shooting. Shack, Johnson, and C.R. went to a friend's house for about 30 minutes. They left the house and were

5

driving back to C.R.'s house, which was one block from where the shooting occurred, when they were pulled over by police. Johnson estimated that they were pulled over about 30 to 45 minutes after the shooting. The .22-caliber gun they had been using for target practice was still in the car. One of them hid ammunition for the gun in a sock.

All three men identified defendant as the shooter in a six-pack photographic lineup. C.R. and Johnson denied that they were members of a gang. Johnson told police that defendant took the empty cartridges out of the gun and threw them out the window of the car. A search of the area where they were purportedly thrown revealed no casings. C.R. told officers later that defendant said after the shooting that he had "put in work for [his] hood," and that he hoped he shot someone in the crowd.

2. *Witnesses in the neighborhood*

On that day, in the early afternoon, Carmen Notte was visiting a friend who lived at the corner of Hacienda and Via Real. Notte was in the garage that he claimed at trial was only partially open. Notte saw a group of kids walking down Hacienda and then witnessed them turn onto Via Real.

A car drove up and stopped. Someone started shooting from the passenger's side of the car. Notte was not sure if the shooter exited the car. He heard two or three quick gunshots. He could not see the gun. Notte later told the police that the shooter was a Hispanic male and that he was in the car shooting back toward the kids. Notte believed that the kids who were shot at ran to the desert.

Scott Wittig was employed by the City of Desert Hot Springs. On that day, he was at a building located near Via Real and Hacienda Avenue. Wittig heard three gunshots and called 911. Wittig told the 911 operator that there had just been a shooting. He also

6

described that he was watching three to five "kids" or teenagers running in a vacant field near West Drive and Hacienda Avenue, just north of the shooting. They were hiding in the bushes. One of the people he saw in the desert had on a black shirt. Wittig described the people who had fled the shooter to the 911 operator, including a person in a blue and white plaid shirt.

Andrew Falcon-Nava was living on Via Real on April 6, one house from the corner of Via Real and Hacienda. His girlfriend was Sharon Taff. He told Taff to call 911 because someone was shooting from a car by his house. He heard "a bunch of gunfire." Nava saw a Hispanic "kid" hanging out of the passenger's side door of the car. He was holding onto the car with his left hand, and his right hand was out the door shooting. The car did not stop. Nava could not identify defendant as the shooter. Nava saw a "bunch of kids" running into the desert. Nava explained that when he saw the shooter, the shooter was pointing the gun toward the ground. However, he heard shots before this and could not say the direction that they went.

Taff reported to the 911 operator that she lived at 13088 Via Real. She had seen some "Mexican kids" standing on the corner near Hacienda and Via Real. A car drove by and fired shots at them. Taff did not know if anyone was shot. There were four people in the car.

### 3. *Police investigation*

Desert Hot Springs Police Officer Paul Tapia was on patrol that day. He received a call at 3:25 p.m. that shots had been fired and a description of the suspect vehicle. About 4:58 p.m., he initiated a traffic stop two streets from where the shooting occurred. Shack was driving, Johnson was in the passenger's seat, and C.R. was in the backseat.

7

Johnson blurted out, "Officer, I'll tell you everything. I know everything. I promise." Johnson told Officer Tapia that there was a gun in the car. Officer Tapia went to the scene of the shooting and found nothing of evidentiary value. Officer Tapia did not recall if any other calls regarding shots being fired in Desert Hot Springs were received that day.

Terry Sherman was a crime scene investigator employed by the Desert Hot Springs Police Department. He was called on that day to the police station to take photographs of Marcos Mendez. He took a picture of a red mark on Mendez's arm. He could not be sure from the photograph if it was a gunshot wound. Mendez also had a red substance on his shirt that was suspected to be blood. After he photographed Mendez, he went to where Johnson, C.R., and Shack had been pulled over and took photographs of the vehicle and its contents.

A fully loaded .22-caliber gun was found in the center console in the front of the car. That type of gun would not expel casings. No casings were found in the car. Beer cans were found in the vehicle. Live ammunition for a .22-caliber gun was found in a sock in the vehicle. A preliminary gunshot residue test was conducted on C.R., Johnson, and Shack. They were all negative. Fingerprints were taken from the inside and outside of the vehicle. Two of Martinez's fingerprints were found on the vehicle.

David Topping was an investigator employed by the Riverside County District Attorney's Office but also contracted out as a detective for the Desert Hot Springs Police Department. At 3:25 p.m. on the date in question, he was at a city facility located on Hacienda Avenue, about 100 yards from Hacienda and Via Real. He heard three or four

8

shots being fired. Based on the sound of the shots, he believed that either a nine-millimeter or a .38-, .357- or .40-caliber gun was used.

Topping was not aware of any other shootings that occurred that day in Desert Hot Springs.

After Topping heard the gunshots, he heard calls on the police radio that the victim had arrived at the Desert Hot Springs police station. Topping then went to the Desert Hot Springs police station and saw Mendez. Topping spoke with Mendez at the hospital after Mendez had been transported by ambulance. Mendez had what appeared to be a gunshot wound. Mendez told Topping that he did not know who had shot him. He had no information about the shooting.

Desert Hot Springs Police Officer Stephen O'Connor was on duty on April 6, 2010, at 3:30 p.m. He responded to shots being fired at Via Real and Hacienda. He contacted Notte. Notte told Officer O'Connor that he saw two juveniles walking on Via Real. He then saw a car drive down the street with what he described as four Hispanic males. The rear passenger leaned out of the vehicle and shot three to four shots directly at the two juveniles. The juveniles then ran to the desert. Notte said nothing about only being able to partially see because the garage door was only up halfway.

Officer O'Connor "at some point," after speaking with Notte, returned to the Desert Hot Springs police station. He had contact with Mendez, who had what he described as a "wound." He appeared to Officer O'Connor to be suffering. Mendez was drifting in and out of consciousness.

### 4. *Gang evidence*

Desert Hot Springs Police Detective Michael Valentich was assigned to a violent-gang task force. He explained that committing violent crimes earns a gang member respect in the gang. The common symbol for the True Crime Boys gang was TCB. TCB was a rival of West Drive. Detective Valentich had personally arrested at least two TCB members who were in possession of guns.

Detective Valentich stated that on April 6, 2010, TCB had more than three members and engaged in the primary activities or violent crimes of a gang. In 2009, Enrique Delgado was a passenger in a vehicle in Palm Springs that was stopped by police. He was found with a loaded shotgun, admitted he was a TCB gang member, and was convicted of being a gang member in possession of a firearm. In 2008, Delgado had also been in possession of a loaded firearm in a vehicle. In 2007, another TCB gang member was convicted of being in possession of a firearm.

Detective Valentich surmised that defendant was an active TCB gang member. Defendant had referred to the group that was fired on as West Drive or "wet dicks," which was a derogatory term for West Drive members. After the shooting, defendant stated to those in the car that he hoped he got one of the them and that they were his enemy. Defendant had been in the presence of other TCB gang members in the past. Defendant's MySpace page had his moniker, references to TCB, and derogatory terms for West Drive gang members.

Defendant also had TCB gang tattoos. Detective Valentich had no information that Shack, C.R., or Johnson were active gang members.

10

In Detective Valentich's opinion, a TCB gang member would be putting in work for the gang by killing or attempting to kill a West Drive member. Little One and Negro, who C.R. said were in the crowd, were West Drive members. Mendez, the victim, who was also known as Marcos Vasquez, was a documented member of West Drive. Detective Valentich had not seen Mendez since the shooting.

In Detective Valentich's opinion, when given facts identical to the ones in this case, he surmised that this type of shooting was committed for the benefit of the TCB gang. He based his opinion on the fact that the shooting was against a rival gang member, which was "one of the most glamorous things that somebody can do" for a gang. He concluded, "Obviously, this crime . . . wasn't a one-on-one shooting; he did it . . . in the presence of others. He identifies them before and after. He says, "They're my enemy." This also creates fear and intimidation in the rival gang, and also, as the word spreads through the community, it will make that gang more fierce and more feared in the community allowing them to do essentially whatever they want with little or no interference."

B.    *Defense*

Amanda Ramsey lived three houses down from the corner of Via Real and Hacienda. She had just pulled into her driveway when she heard some "pops." She said that it sounded like a firecracker or gunshots from a smaller gun, such as a .22-caliber gun.

Mendez was treated at the hospital around 4:30 p.m. that day. Mendez had no injuries to his bones. He had small metal fragments, which could not be identified as a bullet by the treating physician, and soft tissue swelling on his arm. The fragments were

11

not removed and did not cause Mendez any problems. He required surgery because he had an injury to a main artery in the arm. The artery had to be repaired by using a vein taken from his leg. It was a major injury that if left untreated would have caused Mendez to bleed out and possibly lose his arm.

III

INSUFFICIENT EVIDENCE THAT

MENDEZ WAS A VICTIM OF THE CRIME

Defendant contends that the evidence does not support that Mendez was a victim of the shooting committed by him. As such, the great bodily injury and weapons use enhancements found true by the jury (§§ 12022.7, subd. (a), 12022.53, subd. (d)) lack sufficient evidence.[3]

A.      *Standard of Review*

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must

---

[3]      Evidence that Mendez told police where he was shot was excluded by the trial court as hearsay. Mendez did not testify at trial.

12

be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

B.      *Analysis*

Here, defendant does not dispute that if the evidence established that Mendez *was* part of the crowd that was shot at, the elements of the crimes would be shown by the evidence. Hence, we only consider whether the evidence shows that Mendez was shot by defendant.

"'A reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence."' [Citations.]" (*People v. Cluff* (2001) 87 Cal.App.4th 991, 1002.) However, "[a]n appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Here, the evidence that Mendez was shot by defendant was supported by reasonable inferences drawn from the record, not speculation or imagination.

The jury could reasonably infer that Mendez was shot by defendant. At 3:25 p.m., defendant shot at a group of West Drive gang members. Defendant fired anywhere from

13

three to six times.  After he shot, C.R. heard him say that he "got those fuckers," and he also said that he hoped he got someone.  Although no witness testified that they saw someone in the group get shot, the jury reasonably could infer from defendant's statements that he was clearly trying to shoot them and, based on C.R.'s testimony, that he was shooting at the crowd.

In addition, Wittig told the 911 operator that, just after he heard the gunshots, he saw a group running into the desert and hiding in the bushes.  He described them as follows:  "[O]ne guy was a wearing a blue and white plaid shirt, a white t-shirt, a blue, a black t-shirt."  In the photographs of Mendez, he is wearing a blue and white plaid shirt that had blood on it.  It is a reasonable inference from this evidence that Wittig saw Mendez running from the scene of the shooting.

Finally, Mendez showed up at the Desert Hot Springs police station "shortly" after the calls of gunshots at Hacienda and Via Real.  Although there was no specific time given as to when Mendez arrived at the police station, the jury could reasonably infer it was just after the shooting that occurred at 3:25 p.m., based on Topping's testimony that right after the shooting he heard calls that Mendez was at the police station and evidence that he was treated at the hospital at 4:30 p.m.  Moreover, officers testified that they were unaware of any other calls of shots fired in Desert Hot Springs during that time period.

Based on the foregoing, it was a reasonable inference from the evidence that Mendez was in the group of West Drive members that was shot at by defendant.  Mendez suffered a gunshot wound.  As such, defendant's convictions were supported by the evidence.

14

# IV

## INSUFFICIENT EVIDENCE OF GREAT BODILY INJURY TO SURVIVE A

## PENAL CODE SECTION 1118.1 MOTION

Defendant contends that even if the evidence supports that he shot Mendez, the evidence at the conclusion of the People's case-in-chief did not establish that Mendez suffered great bodily injury. As such, the trial court should have granted defendant's motion to dismiss the great bodily injury allegations brought pursuant to section 1118.1.[4]

A.    *Additional Factual Background*

After the People rested their case-in-chief, defendant brought a motion pursuant to section 1118.1 seeking a directed verdict for the enhancement alleged pursuant to section 12022.7. Defendant argued that there was no evidence of great bodily injury. The only evidence was a gunshot wound. There was no evidence of the degree of trauma that Mendez suffered. No reasonable jury could find the evidence supported the enhancement beyond a reasonable doubt.

The People argued that the very nature of a gunshot wound is inherently significant or substantial. The People insisted that "[a] gunshot wound is not a minor or moderate injury." Defendant countered that a gunshot wound can be a minor or small wound.

---

[4]    Defendant recognizes that the section 1118.1 motion was brought only for the section 12022.7 allegation, but he claims it equally applies to the section 12022.53, subdivision (d) enhancement. He argues that if this court finds that he waived the claim on the section 12022.53, subdivision (d) allegation, he received ineffective assistance of counsel. We reject the claim under both sections.

The trial court ruled, "As to the G.B.I. argument, motion's going to be denied. The Court heard evidence that there was a gunshot wound to . . . the victim's arm and that he was drifting in and out of consciousness as a result of this injury, and I think that's sufficient for the G.B.I. enhancement, and that's a jury issue for the jury to determine."

B.    *Analysis*

Section 1118.1 provides in pertinent part:  "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

"'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged."' [Citation.]  'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.]  The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.]  The sufficiency of the evidence is tested at the point the motion is made.  [Citations.]  The question is one of law, subject to independent review.  [Citation.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)

16

Section 12022.7, subdivision (a) provides for imposition of an enhancement on "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony . . . ." Section 12022.7, subdivision (f) defines great bodily injury as "a significant or substantial physical injury." Section 12022.53, subdivision (d) provides for an additional enhancement for a person who personally and intentionally discharges a firearm and causes great bodily injury. It refers to section 12022.7 for the definition of great bodily injury. (§ 12022.53, subd. (d).)

Great bodily injury does not require that the victim suffer permanent, prolonged, or protracted disfigurement, impairment, or loss of bodily function. (*People v. Escobar* (1992) 3 Cal.4th 740, 749-750.) Gunshot wounds to soft tissue can constitute great bodily injury. (See *People v. Mendias* (1993) 17 Cal.App.4th 195, 201, 205-206 [unextracted bullet but with no residual pain and immediate release from the hospital constituted great bodily injury]; *People v. Lopez* (1986) 176 Cal.App.3d 460, 462, 465 [great bodily injury occurred where one victim was shot in buttock and another in thigh with no further evidence].)

Here, at the close of the People's case-in-chief, the jury had been advised that Mendez had suffered a gunshot wound to his arm. Further, the jury was shown photographs of the injury inflicted. Based on the photographs, there was a wound to his arm, and his shirt had a significant amount of blood. Other photographs clearly showed him grimacing in pain and sweating profusely. In addition, the jury was shown photographs of him being treated by paramedics and being taken away on a gurney. One of the officers testified that Mendez was going in and out of consciousness during the treatment.

17

Based on this evidence, the trial court could find that the evidence established great bodily injury and properly denied defendant's section 1118.1 motion for acquittal.

V

INSUFFICIENT EVIDENCE OF THE GANG CRIME AND ENHANCEMENT PURSUANT TO PENAL CODE SECTION 186.22, SUBDIVISIONS (a) AND (b)(1)

Defendant contends the evidence was insufficient to support his convictions for the gang crime and enhancement (§ 186.22, subds. (a) & (b)(1)) because the evidence established that he acted alone and not in concert with other gang members. In light of *Rodriguez*, we find the evidence did not support his conviction for the substantive gang crime pursuant to section 186.22, subdivision (a). However, the evidence supports the gang enhancement under section 186.22, subdivision (b)(1).

We have set forth the facts presented by the gang expert and the standard of review for sufficiency of the evidence, *ante*. "The substantive offense defined in section 186.22(a) has three elements. Active participation in a criminal street gang, in the sense of participation that is more than nominal or passive, is the first element of the substantive offense defined in section 186.22(a). The second element is 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,' and the third element is that the person 'willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' [Citation.]" (*People v. Lamas* (2007) 42 Cal.4th 516, 523.)

In *Rodriguez*, the California Supreme Court held that the third element of the offense is not satisfied when a gang member commits a felony while acting alone. (*Rodriguez, supra,* 55 Cal.4th 1125.) The word "members," as the Supreme Court

18

explained, "is a plural noun." (*Id*. at p. 1132.) "Therefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22 (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Ibid.*) The felonious criminal conduct referred to in the statute must be committed "'by members of that gang.'" (*Id.* at p. 1131.)

Despite the fact that defendant was a TCB gang member, the evidence presented below did not establish that the other persons with defendant at the time he shot Mendez were gang members. As such, we are bound by the decision in *Rodriguez* that the evidence was insufficient to support his conviction of violating section 186.22, subdivision (a). (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

However, we need not reverse his conviction for the enhancement under section 186.22, subdivision (b)(1). To prove a gang enhancement allegation under section 186.22, subdivision (b)(1), the People must prove that the crime for which the defendant was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) "In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing,

19

attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period. [Citation].)" (*People v. Gardeley* (1996) 14 Cal.4th 605, 617, italics omitted.)

To meet the first prong, the crime must be gang related. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) A crime is not gang related simply because it is committed by gang members. (*Ibid*.) However, where an expert opines that "particular criminal conduct benefited a gang by enhancing its reputation for viciousness[, this] can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)." (*Id.* at p. 63.)

As to the second prong of the enhancement, "specific intent to *benefit* the gang is not required. What is required is the 'specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'" (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [Fourth Dist., Div. Two].) "It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation. [Citation.]" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196.)

In *Rodriguez*, the court distinguished the enhancement from the substantive gang crime embodied in section 186.22, subdivision (a). "Section 186.22(a) and section 186.22(b)(1) strike at different things. The enhancement under section 186.22(b)(1) punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote the gang. [Citation.] However, '[n]ot every crime committed by gang members is related to a gang.' [Citation.] As such, with section 186.22(a), the Legislature sought to punish gang members who acted *in concert* with other gang

members in committing a felony regardless of whether such felony was gang related. [Citation.]" (*Rodriguez, supra,* 55 Cal.4th at p. 1138.)

It further held, "A lone gang member who commits a felony will not go unpunished; he or she will be convicted of the underlying felony. Further, such a gang member would not be protected from having that felony enhanced by section 186.22(b)(1), which applies to 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .' Because the gang enhancement under section 186.22(b)(1) requires both that the felony be gang related and that the defendant act with a specific intent to promote, further, or assist the gang, these requirements provide a nexus to gang activity sufficient to alleviate due process concerns. [Citation.]" (*Rodriguez, supra*, 55 Cal.4th at pp. 1138-1139.)

Here, there was ample evidence that defendant was a TCB gang member, that he shot at rival members of West Drive, and that it was the type of crime committed to further the gang. Defendant does not dispute this evidence and only contends that he acted alone. As stated in *Rodriguez,* a gang member can violate section 186.22, subdivision (b)(1) while acting alone. There are no grounds for reversing defendant's conviction of the enhancement under section 186.22, subdivision (b)(1).

21

# VI

## DISPOSITION

We reverse defendant's conviction for violating Penal Code section 186.22, subdivision (a).  This does not affect defendant's sentence.  The superior court is directed to file an amended abstract of judgment accordingly and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:


HOLLENHORST
Acting P. J.


McKINSTER
J.

22