Filed 1/22/15  P. v. Xiong CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>KHUE XIONG et al.,<br><br>  Defendants and Appellants. | F067016<br><br>(Fresno Super. Ct. No. F12904101)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

Gideon Margolis, under appointment by the Court of Appeal, for Khue Xiong, Defendant and Appellant.

John L. Staley, under appointment by the Court of Appeal, for Kou Hang, Defendant and Appellant.

John Hardesty, under appointment by the Court of Appeal, for Jesse Vang, Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Melissa Lipon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendants Khue Xiong, Jesse Vang, and Kou Hang were convicted of burglarizing Monica Trujillo's home while she was inside. Thereafter, they led pursuing officers on a vehicle chase. According to a gang expert, all three were members of the URC gang.

The jury found that several of defendants' crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang. (See Pen. Code § 186.22, subd. (b)(1).)[1] Defendants contend there was insufficient evidence their crimes were gang-related. We disagree, concluding there was sufficient evidence the crimes were committed "in association with" a criminal street gang.

We also hold defendant Vang waived his current contention that evidence of defendant Xiong's prior jail classification admissions was improperly allowed.

Finally, pursuant to a concession from the Attorney General, we will order defendant Xiong's abstract amended to reflect an additional day of custody credit.

We affirm the judgments.

## BACKGROUND

The information in this case charged defendants Khue Xiong, Kou Hang, and Jesse Vang with first degree residential burglary committed while a nonaccomplice was present in the residence (count I - §§ 459, 460, subd. (a), 667.5, subd. (c)(21)); receiving stolen property (count II - § 496, subd. (a)); and active participation in a criminal street gang (count V - § 186.22, subd. (a)). The information also charged Hang with assaulting a peace officer with a deadly weapon or instrument (count III - § 245, subd. (c)) and driving a vehicle in willful or wanton disregard for the safety of persons and property while attempting to elude a pursuing peace officer's motor vehicle (count IV – Veh. Code, § 2800.2.) The information further alleged that counts I through IV were

---

[1] All subsequent statutory references are to the Penal Code unless otherwise noted.

2.

committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) Finally, the information alleged Xiong had served a prior prison term (§ 667.5, subd. (b)), and Vang was a minor over the age of 16. (Welf. & Inst. Code, § 707, subd. (d)(1).)

A jury convicted all three defendants of first degree burglary and found that a nonaccomplice was present. The jury acquitted Hang of assaulting a peace officer with a deadly weapon or instrument, did not return a verdict as to whether Hang actively participated in a criminal street gang, and convicted Hang of evading a pursuing peace officer with willful or wanton disregard for the safety of persons or property. The jury convicted Xiong and Vang of actively participating in a criminal street gang. The jury also found that counts I, II, and IV were committed for a benefit of a criminal street gang. Xiong admitted the prior prison term.

The court sentenced defendants as follows: Hang received a total prison term of six years eight months; Xiong received a total prison term of 16 years; and Vang received a total prison term of 12 years.

All three defendants now appeal.

## FACTS

On the afternoon of June 4, 2012, the doorbell rang at Monica Trujillo's home. Trujillo looked through the peephole and saw a man with red shoes. She "figured it was just a solicitor" and sat down on her couch in the living room. The doorbell rang again, and possibly a third time. Trujillo looked through the peephole again and this time there were two more individuals outside. She looked out a window and saw an unfamiliar car across the street. Trujillo saw one of the men jumping her fence, so she ran to her laundry room and dialed 911.

Trujillo moved to a closet under some stairs. While in the closet, Trujillo could hear multiple people in her home. She heard two people running, footsteps on her stairs, and multiple people talking.

Fresno Police Department Officer Frank Nelson eventually arrived and knocked on Trujillo's door. Trujillo left the closet and spoke with Officer Nelson. Trujillo walked through the home with Nelson and identified several items that were missing. She also noted several instances where the burglars had ransacked her furniture including overturning her couch and moving mattresses off of boxsprings.

Officer Christopher Cooper testified that he was dispatched to a burglary in progress at a residence on Ellendale shortly after 1:00 p.m. that day. As Cooper drove towards the burglary scene, he received an update from dispatch that the suspects were three Asian males who were possibly leaving the residence. As Cooper pulled up to the intersection of Flint and Ellendale, a Silver Honda with three Asian males inside turned left in front of him. At trial, Cooper identified the driver of the vehicle as defendant Kou Hang, the front passenger as defendant Jesse Vang, and the rear passenger as defendant Khue Xiong.

Officer Cooper pulled up behind the Honda and requested over the radio for his partner – who was driving separately – to rejoin him. Once his partner came close in his own vehicle, Cooper activated his emergency lights. The Honda initially slowed, but then began to accelerate away. Cooper could see the driver checking his rear view mirror to watch Cooper's vehicle. Cooper then activated his emergency siren and advised dispatch he was in pursuit of the vehicle. As the driver tried to turn the Honda into a neighborhood, the brakes locked up, and the vehicle overshot the intersection. The driver regained control.

Officer Cooper requested permission from his sergeant to use the "pit maneuver" to stop the vehicle. Cooper described the "pit maneuver" as follows: When an officer "use[s] the front of his car to push the rear of the suspect vehicle, which causes it to spin, which causes the transmission to mash up, which kills the engine and disables the car …." Cooper attempted the "pit maneuver" multiple times, but the Honda would weave back and forth.

4.

Eventually they all approached a dead end on Pico Avenue. The front brakes of the Honda locked up. Officer Cooper slowed down and reached for his door to exit his vehicle. He looked up and saw that the Honda was "coming directly" at him. Cooper engaged his brakes and the Honda struck the front of his patrol car. The Honda then passed Cooper and started to drive away. Cooper made a U-turn and continued pursuit.

Eventually the Honda attempted to make a left turn and locked its front tires. The vehicle collided into several poles that protected a fire hydrant. Officer Cooper wedged his vehicle against the Honda to prevent it from moving.

The three defendants exited the vehicle and began running in the same direction. Officer Cooper yelled for them to stop, but they failed to do so. Cooper could hear sirens approaching as he chased the defendants. Vang and Hang were able to jump over a fence, but Xiong "got tangled up on the top of the fence," and Cooper was able to grab him. Cooper told Xiong to stop resisting, but Xiong kept moving. Cooper did a "leg sweep" and knocked Xiong to the ground. Xiong reached towards his pants and Cooper grabbed his hand. Xiong grabbed Cooper's arms by the wrists and moved them away. Cooper punched Xiong several times. Cooper's partner arrived and pressed a Taser against Xiong's chest. Xiong then submitted to arrest.

A perimeter was set up, and a K-9 search was initiated. A California Highway Patrol (CHP) helicopter arrived and circled the area. During the search, Vang "gave himself up." Hang was found hiding on top of a recreational vehicle and was taken into custody.

Officer Cooper went to the Honda and saw a laundry basket "full of items." He also saw a purse in the vehicle. The purse contained medication with Monica Trujillo's name on it. Other items belonging to Trujillo were found in the Honda.

Trujillo identified Vang as one of the three men who had been at her house. Officers searched Hang and found on his person a gold coin with square casing around it. An officer described it to Trujillo, who confirmed the coin was missing from her home.

5.

Officer Cooper testified that Detective Szatmari identified each defendant as a member of the URC at the scene of their arrest.

*Gang Evidence*

Michael Szatmari, a detective with the CHP, testified as a criminal street gang expert. Detective Szatmari testified that the URC is a criminal street gang with more than 60 members. URC "primarily" means "Unknown Regulator Crew or Click" but can also mean "Unknown Rapist Crew." URC associate themselves with "blood gangs" and are rivals with the Asian Crips, Oriental Ruthless Boys and Purple Brothers. They are associated with the number "526" and the letters "URC." URC gang members are also associated with red clothing and refer to one another by nicknames. While the URC is not a "traditional turf-oriented gang" they are associated with a complex known as the Weber Gardens Apartments.

Gang loyalty in the URC is paramount. There is a "don't snitch culture" in the gang. Respect is also an important aspect of gang membership. The expert testified that "[e]verything" gang members do "is geared towards getting … respect."

In Detective Szatmari's opinion, all three defendants are members of the URC gang.

### Xiong

Xiong had identified himself as a member of URC in eight out of nine jail classifications and had tattoos reading "URC" and "Regulators." Detective Szatmari reviewed several photographs of gang members displaying gang hand signs while Xiong was with them. Xiong had previously been arrested with other gang members and was identified as a gang member by a statewide law enforcement agency.

### Vang

Vang had several tattoos, including "URC 526" inside a depiction of a hand displaying a URC gang sign. Detective Remington from the Sheboygan Police Department in Wisconsin informed Detective Szatmari that Vang had been identified as

6.

an active URC member in Sheboygan. Vang had previously been taken into custody along with three gang members.

### Hang

On two prior occasions, Hang had been contacted by law enforcement officers while in the presence of other URC gang members. In both instances, Hang was wearing red clothing. In another incident, Hang was arrested along with a URC member. On the basis of these prior law enforcement contacts, Detective Szatmari concluded Hang was an active member of the URC gang.

In a different case, Detective Szatmari was asked to review information regarding Hang to determine whether gang charges were applicable. In that case, Detective Szatmari concluded there was "probably not enough" to file gang charges against Hang. However, after the June 4, 2012, incident, Detective Szatmari "went back … researched all of his cases" and concluded Hang was a URC gang member.

Detective Szmatari testified that a hypothetical crime with facts similar to the June 4, 2012, incidents would have been committed in association with and for the benefit of the URC gang. He explained:

> "[T]he burglary, or the entering the house and stealing stuff, you're committing this in association and benefitting the URC. You are assisting each other in committing the crime. The best chance of succeeding committing the crime is getting help, so you're helping your fellow gang members commit a burglary, and so it's benefitting the gang because your chances of succeeding increase and you're keeping your gang members out on the street."

*Accident Reconstruction*

Hang called an expert witness who reconstructed the collision between the Honda and Officer Cooper's patrol vehicle.

## ANALYSIS

### I.
### THERE WAS SUFFICIENT EVIDENCE DEFENDANTS' CRIMES WERE COMMITTED IN ASSOCIATION WITH A GANG

The gang enhancement applies to felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang …."  (§ 186.22, subd. (b)(1).) Defendants argue there is insufficient evidence that the crimes in this case were gang-related under section 186.22, subdivision(b)(1).  We disagree.

We note at the outset that defendants are correct in one respect:  The evidence that these crimes were committed "for the benefit" of the URC gang is not overwhelming.  As defendants note, there was no evidence they displayed gang hand signs, shouted gang slogans, or painted gang graffiti.[2]  However, showing that a felony was committed "for the benefit of" a gang is only one of three ways to meet the gang-relatedness requirement of the statute.  (See § 186.22, subd. (b)(1).)  The gang-relatedness requirement may also be satisfied with evidence the crime was committed "in association with" the gang. (§ 186.22, subd. (b)(1); see also *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["Defendant argues that reliance on evidence that one gang member committed a crime in association with other gang members is 'circular.…'  Not so.  Arguably, such evidence alone would be insufficient, even when supported by expert opinion, to show that a crime was committed for the *benefit* of a gang.  The crucial element, however, requires that the crime be committed (1) for the benefit of, (2) at the direction of, *or* (3) *in association* with a gang" (italics in original)].)  Here, there was strong evidence to support an inference that defendants' crimes were committed "in association with" a gang as that phrase has been defined by the Supreme Court.

---

[2] Trujillo did testify that the man who knocked on her door was wearing red shoes. Detective Szatmari testified that URC gang members are associated with red clothing.

8.

*People v. Albillar*

In *People v. Albillar* (2010) 51 Cal.4th 47 (*Albillar*), the Supreme Court analyzed a challenge to the sufficiency of the evidence in support of a section 186.22, subdivision (b)(1) enhancement. The defendants in *Albillar* were two twin brothers and their cousin, all members of the same gang. (*Albillar*, *supra*, 51 Cal.4th at p. 51.) The three men "met up" with several girls. (*Ibid.*) At one of the defendant's apartments, the three men raped one of the girls.[3] (*Id.* at pp. 52–53.) Each defendant was convicted of several crimes including forcible rape and forcible rape by a foreign object. (*Id.* at p. 54.) The jury also found that these two forcible rape counts were committed for the benefit of, at the direction of, or in association with a criminal street gang. (*Ibid.;* see also § 186.22, subd. (b)(1).)

The *Albillar* defendants contended there was insufficient evidence that the crimes were gang-related. They argued that " 'it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang.' (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198 [].)"[4] (*Albillar*, *supra*, 51 Cal.4th at p. 62.) Nonetheless, the Supreme Court determined there was sufficient evidence of gang-relatedness in that the crimes had been committed "in association with" a gang.[5] (*Id.* at p. 60.)

The Supreme Court identified certain types of evidence that supported the inference that the rape in that case had been committed "in association with" a gang.

---

[3] One of the defendants also had sex with the victim's friend and was convicted of unlawful sex with a minor. (*Albillar*, *supra*, 51 Cal.4th at p. 54.)

[4] The dissent in *Albillar* urged that the statutory language "in association with any criminal street gang" must require something more than simply showing gang members committed a crime in association with one another. (*Albillar*, *supra*, 51 Cal.4th at pp. 72–73.)

[5] The Supreme Court also determined there was sufficient evidence the crimes were committed "for the benefit" of the gang. (*Albillar*, *supra*, 51 Cal.4th at p. 60.)

9.

(*Albillar*, *supra*, 51 Cal.4th at pp. 60–63.) At trial, an investigator testified that gang members earn respect by committing crimes together. (*Id.* at p. 60.) Moreover, gang members choose to commit crimes together because it increases their chance of success. (*Ibid*.)

Application

Here, Detective Szatmari testified that the defendants assisted each other in committing the burglary and evasion. This mutual assistance increased the chance of successfully completing the crimes.

Detective Szatmari also testified that gang members "know what activities that their fellow gang members are doing." Therefore, "[f]ellow gang members are going to respect [defendants] more because they've shown that they are willing to commit these criminal acts …."[6]

Because this evidence raises an inference these crimes were committed in "association with" a gang (see *Albillar*, *supra*, 51 Cal.4th at pp. 60–61), we reject defendants' contention that there was insufficient evidence of gang-relatedness.

## II.
## DEFENDANT VANG WAIVED HIS CHALLENGES TO THE ADMISSIBILITY OF DETECTIVE SZATMARI'S TESTIMONY REGARDING DEFENDANT XIONG'S JAIL CLASSIFICATION ADMISSIONS

Defendant Vang argues that Detective Szatmari's testimony regarding defendant Xiong's prior jail classification admissions violated *Miranda v. Arizona* (1966) 384 U.S. 436 and *Crawford v. Washington* (2004) 541 U.S. 36.

Vang waived these contentions by failing to object below. (Evid. Code, § 353, subd. (a).)

---

[6] Detective Szatmari went on to discuss this consideration in further detail with respect to the assault with a deadly instrument count specifically. Hang was ultimately acquitted on that count.

To avoid the import of the failure to object, Vang asserts his trial counsel was ineffective. However, " 'the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged.' " (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.) " 'In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal.' [Citation.]"[7] (*Ibid*.) We affirm Vang's conviction.

Moreover, any error was harmless. The evidence of Xiong's gang ties extended well beyond the jail classifications. Xiong had tattoos reading "URC" and "Regulators," he had been classified as a gang member by a statewide law enforcement agency, and he had been photographed with gang members displaying gang signs.

## III.
## DEFENDANT XIONG'S ABSTRACT OF JUDGMENT MUST BE AMENDED TO REFLECT ONE ADDITIONAL DAY OF CUSTODY CREDIT

Defendant Xiong contends he is entitled to one additional day of presentence custody credit. Respondent concedes the issue. We will order Xiong's abstract of judgment amended to reflect 312 days of actual custody credits.

---

[7] During closing arguments, Vang's counsel tried to undermine the evidence Vang participated at all in the burglary and argued that "presence without participation is not a crime." He noted that Trujillo had testified that "she only hear[d] two people" in her home.

This defense theory suggests one plausible explanation for Vang's failure to object to evidence of Xiong's gang history. If only two of the three defendants had been in the home, any evidence tending to show Xiong and/or Hang were the perpetrators would be arguably beneficial to Vang. It is therefore plausible that Vang's counsel might have purposefully chosen not to object to evidence that Xiong had undergone at least nine jail classification interviews in his life.

11.

# DISPOSITION

The trial court is directed to amend Defendant Xiong's abstract of judgment to reflect 312 days of actual custody credits and to transmit copies of the amended abstract to the appropriate parties and entities.  In all other respects, the judgments are affirmed.

_____
Poochigian, Acting P.J.

WE CONCUR:

_____
Detjen, J.

_____
Peña, J.

12.