Filed 6/8/16  P. v. Carson CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MALIK DEVON CARSON AND WILLIAM ANTHONY LEWIS,<br><br>    Defendants and Appellants. | G052129<br><br>(Super. Ct. No. FVI1203002)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Affirmed as modified.

Dacia A. Burz, under appointment by the Court of Appeal, for Defendant and Appellant, Malik Devon Carson

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant, William Anthony Lewis.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Malik Devon Carson and William Anthony Lewis (defendants) guilty of robbery, carjacking, and street terrorism (counts 1, 2, 5), and Carson guilty of evading a police officer (count 3). The jury found true allegations defendants committed robbery and carjacking for the benefit of, at the direction of, or in association with a criminal street gang (Pen. Code, § 186.22, subd. (b)(1); all further statutory references are to the Pen. Code), and personally used firearms in the commission of the crimes (§ 12022.53, subd. (b)).

The court sentenced defendants to an indeterminate term of 15 years to life for carjacking (§§ 215, subd. (a), 186.22, subd. (b)(4)(B)), and imposed a determinate term of two years for robbery, plus 10 years for the gang enhancement (§§ 213, subd. (a)(1)(B)(2), 186.22, subd. (b)(1)(C)). Carson received an additional eight months for evading a police officer. Sentence on count 5, and the remaining enhancements, was stayed under section 654.

Defendants challenge the sufficiency of the evidence to prove the gang enhancement, and they argue section 654 bars punishment for robbery (count 2). We reject defendants' challenge to the sufficiency of the evidence. However, we agree section 654 bars punishment on count 2, and modify the judgment accordingly. As modified, the judgment is affirmed.

**FACTS**

*Crime*

One night in 2012, Luther Avery, a 60-year-old pizza delivery person, was dispatched with pizza and sodas to a particular address in Victorville. Avery used his own car, a white, customized 2006 Chrysler 300, to make the delivery.

When Avery arrived at the address, however, the house and driveway were dark. Under such circumstances, company rules required Avery to stay in his car and call the number provided on the receipt. Avery called the number, and a male voice said, "I'll be there in one minute."

2

As Avery watched in his rearview mirror, Carson and Lewis, then ages 21 and 17, respectively, emerged from the house and approached his car. Carson was wearing a red, Pendleton-type shirt, a hoodie, and red, pinstriped tennis shoes. Lewis was wearing a black and red Chicago Bulls hooded sweatshirt. Carson stood in front of the driver's window, while Lewis went to the passenger window.

Carson pointed a .38-caliber revolver at Avery and yelled, "Get out [of] the car. Give me your money and your pizza." Avery got out of his car. In the process he dropped the pizza, ten $1 bills, and two $5 bills. Lewis grabbed the cash, and Carson demanded Avery's cell phone, keys, and wallet. Avery told Carson his phone and wallet were in the car, and Lewis said, "Let's take the car." With the gun still in his hand, Carson shouted at Avery to "Get out of here, before I shoot you."

Avery ran and hid behind a brick wall. He heard Carson and Lewis get into his car and drive away. Avery called 911 from a nearby home, and he gave the 911 operator a description of defendants and their clothing, and the license plate number of his car. Within minutes, a sheriff's deputy spotted Avery's car on the freeway. The deputy called for backup, and when Avery's car exited the freeway a short time later, two patrol units activated their lights and sirens and gave chase.

Carson, the driver, did not yield to the deputies. Instead, he accelerated to around 110 miles per hour on a residential thoroughfare before smashing into a dirt embankment. The sheriff's deputies quickly apprehended defendants by following shoe prints leading away from Avery's crashed car, and they found a loaded .38-caliber revolver, and Avery's wallet, nearby.

Avery identified defendants as the robbers shortly after the crime and at trial. He told the deputies he also recognized the recovered .38-caliber revolver. Lewis had ten $1 bills and two $5 bills in his pants' pocket. Avery's cell phone and car keys were also recovered. However, Avery's car had extensive exterior damage, and someone had removed two custom-installed television screens from the interior.

3

*Gang Expert Testimony*

Although Avery testified nothing about defendants, or the robbery and carjacking, made him suspect the crimes were gang related, the People charged defendants with street terrorism and alleged sentencing enhancements for gang-related activity.

At trial, the prosecutor called City of San Bernardino Police Officer Raymond Bonshire as the People's gang expert. Bonshire testified about his participation in a multi-agency gang detail in 2012. He had undertaken extensive training on criminal street gangs, and he has detailed knowledge of a wide variety of gangs in Southern California.

The prosecutor specifically asked Bonshire about two San Bernardino gangs, the Little Zion Manor Bloods (LZMB) and the Mankin Davis Mafia (MDM). According to Bonshire, LZMB sprang to life in the 1980's from one large family, the Mankins. At the time, most of the Mankins' family lived in the Little Zion Manor apartment complex in San Bernardino.

During the next thirty years, MDM grew and spread throughout the city, and one subgroup of MDM formed LZMB. By 2012, LZMB had about 80 documented members, many of whom lived in the Little Zion Manor apartment complex. Bonshire testified he knew defendants from prior personal contacts, and because of their affiliation with LZMB.

In Bonshire's opinion, the primary activity of LZMB is the commission of crime, including narcotics sales, robberies, carjackings, shootings, murders, and the illegal possession of firearms. Bonshire also testified about several predicate offenses. For instance, in 2012, Walter Mankin, a documented member of MDM and LZMB, acted in association with four LZMB members and committed a home invasion robbery. The same year, another LZMB member pled guilty to possession for sale of marijuana, and

4

still another to carrying a loaded firearm. Both of these defendants admitted gang enhancements in connection with their crimes.

Bonshire classified LZMB and MDM as "blood-affiliated" gangs, which means their members wear and use the color red to signify gang membership. Gang members identify themselves, communicate, and mark territory with graffiti and tattoos, by the color of their clothing, and by "the way they interact with each other."

LZMB uses "1900" as a symbol, because the Little Zion Manor apartment complex is in the 1900 block of 19th Street. Bonshire has also seen LZMB gang members with tattoos of the State of California, or references to California. He said that is because California Street in San Bernardino forms the western boundary of the Little Zion Manor apartment complex.

Pointing to defendants' clothing on the night of the crime, Bonshire testified members of blood-affiliated gangs like LZMB wear red. Carson's shirt and shoes, and Lewis's Chicago Bulls sweatshirt, are popular items with blood gangs, because of the color red and the capital "B."

As for tattoos, Carson had the words "ZIP Silk" and "1900" encircled by four stars on his left forearm, a Saint Louis Cardinals "L" and "S" on his neck, and "CA" shaded in red on his right arm. Lewis has tattoos of the Boston Red Sox letter "B," the Chicago Bulls symbol, and "Established '92," on his left forearm. On other parts of his body, Lewis has the tattoos "Money," "Power," and "Respect," and the Washington Nationals "W" superimposed over the State of California.

Bonshire believed Carson's "1900," "LS," and "ZIP Silk" tattoos, and both defendants' California tattoos, were directly related to LZMB. He said "ZIP" means "Zion In Peace," and "Silk" was the nickname of a now dead LZMB gang member. Bonshire opined Lewis's "Established '92" tattoo probably referred to Lewis' birthday, and he said the words "Money," "Power," and "Respect" are common gang themes.

5

Bonshire also showed the jury pictures of defendants from their Facebook pages. Although defendants were not together in any of these photographs, the photographs did show defendants making gang hand signs, while in the company of other LZMB gang members.

In Bonshire's opinion, defendants were active members of LZMB, and he based this opinion on his prior experience and training, prior contacts with defendants, and defendants' tattoos, clothing, and Facebook photographs.

As for the inner workings of a criminal street gang, Bonshire emphasized the importance of reputation and respect. He testified these two concepts are the "fuel that powers the gang," and respect is "what keeps them in their status." Individual gang members gain respect by "putting in work for the gang," and their "work" enhances the gang's reputation. Bonshire testified LZMB gang members "are continually involved in criminal activity."

In addition, Bonshire explained why gang members act together. He said, "there's power in numbers," and gang members rely on each other and the gangs' code of conduct, to commit crimes. Plus, individual members gain added respect for acting in concert, because such crimes engender more fear in the community and fear enhances the reputation of the gang. According to Bonshire, a gang's reputation is very important, because a fearsome reputation "allows [the gang] to expand their criminal enterprise."

Bonshire conceded defendants did not shout gang slogans, or otherwise announce their gang status, nor did they commit the crime in LZMB's claimed territory. Nevertheless, when the prosecutor posed a hypothetical question based on the facts of the crimes, Bonshire testified the crimes were committed, "at the direction of, the benefit [of], or association with the Little Zion Manor criminal street gang."

Bonshire also acknowledged these crimes were committed outside San Bernardino, and LZMB is a San Bernardino based gang, but he explained that LZMB

6

gang members frequently head to the desert to commit crimes. According to Bonshire, committing crimes outside San Bernardino garners respect.

Furthermore, Bonshire testified gang members find out about each others' crimes by a variety of means. Consequently, "any acts of violence committed by a gang, that reputation falls within that gang . . . whether it's within the gang's turf or outside, that reputation obtained through violent crimes spreads among the community which allows them to continue to commit crimes. But not only that, it enhances their reputation with other gangs, with the gang members that they interact with on a daily basis."

**DISCUSSION**

*1. Section 186.22, Subdivision (b)*

Defendants do not challenge the sufficiency of the evidence to prove LZMB meets the statutory definition of a criminal street gang (§ 186.22, subd. (e)), nor do they contest the sufficiency of the evidence to prove their active participation in LZMB (§ 186.22, subd. (a)). Defendants limit their challenge to the sufficiency of the evidence to prove the gang enhancement. (§ 186.22, subd. (b).)

*a. Law*

"'"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment . . . ." [Citation.]'" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.) An appellate court presumes "every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*Ibid.*)

7

Section 186.22, subdivision (b)(1) authorizes enhanced penalties upon proof the defendant committed a crime, or crimes, "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1); *Albillar*, *supra*, 51 Cal.4th at pp. 59-60.)

To prove the enhancement, the prosecution must first prove, beyond a reasonable doubt, defendants committed a gang-related crime, i.e., committed a crime "for the benefit of, at the direction of, or in association with a criminal street gang." (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60; *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617 (*Gardeley*).)

Second, the prosecution must demonstrate the defendant committed the crime with the specific intent "'to promote, further, or assist in any criminal conduct by gang members.'" (*Albillar*, *supra*, 51 Cal.4th at p. 59; *Gardeley*, *supra*, 14 Cal.4th at pp. 616-617.) Specific intent may be inferred when the evidence demonstrates the defendant committed "a crime in concert with known gang members." (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322, citing *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*).)

### b. Argument

At trial, the prosecution argued defendants committed the instant crimes for the benefit of, and in association with LZMB. However, we need not discuss the benefit element, because substantial evidence supports the jury's finding defendants committed the instant crimes in association with LZMB. (*Morales*, *supra*, 112 Cal.App.4th at p. 1198 [when substantial evidence establishes the crime was committed "in association" with a gang, the prosecution need not prove that it was committed for the benefit of or at the direction of a gang].)

Defendants assert the People failed to prove they knew each other, let alone that they cooperated as LZMB gang members to commit robbery, carjacking, and

8

evading a police officer. Citing *Morales,* defendants argue they were "on a frolic and detour unrelated to the gang." (*Morales*, *supra*, 112 Cal.App.4th at p. 1198.) Their assertions are plausible, but ignore the standard of review. (See *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048.)

Defendants characterize Bonshire's testimony as speculative and baseless, but his qualification as an expert went unchallenged, and they ignore his prior contacts with them in connection with LZMB. In our view, Bonshire had extensive knowledge of LZMB's background, structure, and primary activities, and he explained how the gang structure encourages gang members to commit crimes together. He said notions of respect and reputation are paramount in gang culture, and Lewis's "Respect" tattoo tends to support this view. Bonshire also testified gang members communicate about their crimes through a variety of means, regardless of what the victim knows during, or does after, the crime, and he explained how gang members rely on the gang culture and mores to commit crimes in concert.

In this case, two active participants in LZMB cooperated to deprive Avery of his personal possessions and car. Throughout the crimes, Carson assisted Lewis by pointing a gun at Avery. Lewis assisted Carson by allowing Carson to focus his attention on Avery, and by deterring any resistance. Bonshire testified LZMB gang members commit these types of crimes for gang purposes, and he explained the culture and behavior of gang members and how both contribute to the gang's criminality. Considering the circumstances of the crimes, Bonshire's expert opinion, and any reasonable inferences to be drawn from both, substantial evidence demonstrates defendants committed robbery, carjacking, and evading a police officer, in association with a criminal street gang. (See *Albillar*, *supra*, 51 Cal.4th at p. 62; *Morales*, *supra*, 112 Cal.App.4th at p. 1198.)

9

Defendants rely on *People v. Ochoa* (2009) 179 Cal.App.4th 650, but the case is inapt. *Ochoa* assessed the sufficiency of the evidence to prove a lone gang member committed carjacking for the benefit of a gang. (*Id.* at p. 652-653.) Here, two active gang members in gang colors committed violent crimes in association with each other.

## 2. Section 654

Count 1 of the information alleged defendants committed robbery by "unlawfully, and by means for force and fear," taking Avery's personal property "from the person, possession, and immediate presence . . . ." At sentencing, defendants argued the personal property described in count 1 necessarily included Avery's car. Consequently, to defendants' way of thinking, section 654 applied to stay sentence imposed on count 2, carjacking. But the court disagreed.

After commenting on the state of the evidence and each side's respective theories of the case, the court found "sufficient evidence to show that there was a robbery that took place of materials or property that was separate [and] distinct from the automobile." The court imposed two years for carjacking, plus 10 years for the gang enhancement, and defendants assert this was error.

"We review under the substantial-evidence standard the court's factual findings, implicit or explicit, of whether there was a single criminal act or a course of conduct with a single criminal objective." (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) Our review is deferential, but the court erred here.

Section 654, subdivision (a), provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." If two offenses

10

were incidental to a single objective, only one sentence may be imposed. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)[1]

Defendants rely on *People v. Bauer* (1969) 1 Cal.3d 368, 372 (*Bauer*), and we find it persuasive. In *Bauer*, the defendants entered the home of three elderly women under false pretenses. They subdued and bound the women, and over the course of two hours, moved numerous items of personal property to a car parked in the garage, before driving away with the loaded car. (*Id.* at pp. 372, 377.)

After trial, the court imposed concurrent sentences for robbery and car theft. (*Bauer*, *supra*, 1 Cal.3d at pp. 371-372.) On review, the California Supreme Court held section 654 barred punishment for both crimes: "where a defendant robs his victim in one continuous transaction of several items of property, punishment for robbery on the basis of the taking of one of the items and other crimes on the basis of the taking of the other items is not permissible." (*Id.* at p. 377; *People v. Ortega* (1998) 19 Cal.4th 686, 700, disapproved on other grounds in *People v. Reed* (2006) 38 Cal.4th 1224, 1228.)

Moreover, *Bauer* rejected the Attorney General's argument section 654 does not apply because defendants formed the intent to steal the car only after completing the robbery. Assuming the robbery was complete, "[t]he fact that one crime is technically complete before the other commenced does not permit multiple punishment where there is a course of conduct comprising an indivisible transaction. [Citations.] And the fact that one of the crimes may have been an afterthought does not permit multiple punishment where there is an indivisible transaction." (*Bauer*, *supra*, 1 Cal.3d at p. 377.)

---

[1] Section 215, subdivision (c) also limits punishment after a person has been charged and convicted of robbery and carjacking based on the same conduct, by stating, "no defendant may be punished under this section and Section 211 for the same act which constitutes a violation of both this section and Section 211."

Also, in *People v. Dominguez* (1995) 38 Cal.App.4th 410 (*Dominguez*), the defendant entered a van, put a "cold and metallic object" against the driver's neck, and said, """"Give me everything you have."""" (*Id.* at p. 414.) The driver gave the defendant two rings and a chain, and then got out of the van and fled. (*Id.* at p. 415.) The defendant was convicted of carjacking and robbery, and the prosecutor conceded the applicability of section 654, but the trial court erroneously imposed a concurrent term for the robbery. (*Id.* at pp. 419-420.)

The appellate court concluded the victim "handed over his jewelry and van by handing over the jewelry and fleeing the van." (*Dominguez*, *supra*, 38 Cal.App.4th at p. 420.) The court observed the "same act" of placing the weapon to the back of the driver's neck "was essential to both offenses and thus [was] not separately punishable." (*Ibid.*) Consequently, the court concluded the robbery and carjacking occurred simultaneously, because the victim handed over his jewelry and *immediately* ran out of his van. (*Ibid.*)

Here, defendants surrounded Avery's car. Carson pointed a gun at Avery and demanded his money and pizza. Avery got out of the car and tried to cooperate. However, by doing so, he relinquished control over the car, his wallet, and cell phone. The events occurred rapidly, within close proximity to each other, and involved a single victim. In our view, defendants committed robbery and carjacking during a single course of conduct. (*Bauer*, *supra*, 1 Cal.3d at pp. 376-377; *Dominguez*, *supra*, 38 Cal.App.4th at p. 420.) Thus, section 654 bars separate punishment on count 2 and the enhancement.

The Attorney General's reliance on *People v. Foster* (1988) 201 Cal.App.3d 20 is misplaced. In *Foster,* the defendants robbed one named victim Sandra Grayson, and forced Grayson and two other victims (Fern Clark, another store employee, and Charles Clark, her husband) into the store cooler and locked them in with a hand cart against the cooler door. The court imposed consecutive sentences on three counts of false imprisonment, and one defendant asserted consecutive sentences for false

12

imprisonment violated section 654. But, in *Foster*, each false imprisonment count was punishable as a crime of violence against a separate individual. (*Id.* at pp. 27-28.) Thus, section 654 did not bar consecutive sentences.

## DISPOSITION

Sentence on count 2 and the enhancement is stayed pursuant to section 654. The clerk of the superior court is directed to modify the abstract of judgment to reflect the section 654 stay and forward a copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

13